STATE of Minnesota, Respondent,

v.

Edbert Neal WILLIAMS, Appellant.

No. C2–97–686.

Supreme Court of Minnesota.

April 22, 1999.

John M. Stuart, Minnesota State Public Defender, Paul C. Thissen, Assistant State Public Defender, Minneapolis, for appellant.

Mike Hatch, Minnesota Attorney General, St. Paul, for respondent.

Susan Gaertner, Ramsey County Attorney, Mark Nathan Lystig, Assistant Ramsey County Attorney, St. Paul, for respondent.

## OPINION

GILBERT, J.

In this direct appeal, we are asked to review several claims of error arising out of the trial and conviction of respondent Edbert Neal Williams. On December 13, 1996 a jury found Williams guilty of one count of first-degree premeditated murder for the January 12, 1996 killing of Genelda Campeau and one count of attempted first-degree murder for an attack on Shelly Campeau on the same date. On appeal, Williams argues that his convictions should be reversed for the following reasons: (1) the trial court committed reversible error in suppressing evidence of a third party's past acts of abuse and harassment towards Genelda and Shelly; (2) the prosecution's failure to disclose evidence of this third party violated the disclosure requirements established in *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963) and Minn. R.Crim. P. 9.01; (3) the trial court committed prejudicial error in admitting evidence of Williams' past acts of abuse towards Shelly; and (4) the trial court committed plain error in seating a juror who was biased in favor of police officers. We affirm.

Sixty-five year old Genelda Campeau was found stabbed to death in her St. Paul home on the evening of January 12, 1996. Genelda's 18-year old granddaughter, Shelly Campeau, claimed to have been attacked by the same assailant. Shelly suffered two stab wounds, but survived.

Shelly told police officers that the assailant was Williams, her former boyfriend. Shelly and Williams had met and began dating in February 1993 and, in April of that same year, Shelly became pregnant by Williams. Shortly thereafter, Williams began physically and verbally abusing Shelly. This abuse continued after the couple's son, Dominic, was born in January 1994.

At trial, several witnesses testified about three specific instances of abuse. Shelly testified about a December 1993 incident in which she fled into Genelda's house after having a fight with Williams. According to Shelly, Williams then threw rocks at Genelda's house, brandished what looked like a knife or screwdriver, and yelled, "I'll get you." A St. Paul police officer testified about being called to respond to the incident and confirmed some of Shelly's testimony. Both Shelly and her mother, Cheryl Campeau, testified about a January 1994 incident in which Williams threatened them. Both Shelly and Cheryl also testified that, in April, 1994, Williams became physically abusive towards Shelly after learning that Shelly had told a welfare agency that Williams was Dominic's father. According to Shelly, Williams said to her and Cheryl, "I'll get you good."

Shelly stopped dating Williams and, in January 1995, she moved in with Genelda to "get [her] life back together." Shelly had lost custody of Dominic, but had visitation rights on weekends. Williams had no custody or visitation rights, but Shelly would routinely call him on weekends and allow him to visit Dominic at Genelda's house. Shelly testified that she and Williams had no arguments during 1995 and that Williams and Genelda also "got along" during this period.

According to Shelly, on January 12, 1996, Williams called her at about 5:30 p.m. and asked to see Dominic, who was visiting Shelly at Genelda's house for the weekend. Shelly agreed to let him see Dominic, and

Williams arrived at Genelda's house at approximately 6:30 or 7:00 p.m. Upon entering the house, Williams removed his shoes so that he would not track snow into the house. Shelly and Williams spoke briefly about a birthday party Shelly was planning for Dominic. Shortly thereafter, Shelly left the house to speak with a friend who was waiting in his car outside. She remained outside for approximately 10 minutes.

When Shelly returned to the house, Williams, Genelda, and Dominic were in the living room. At trial, Shelly testified that neither Genelda nor Williams appeared upset at this time. However, a few days after Genelda's killing, Shelly had told a child protection worker that Williams became "increasingly agitated" during his visit and threatened to take Dominic.

Shelly testified that when she entered the living room Genelda told her that Shelly's boyfriend had been repeatedly calling and then hanging up when Genelda answered the telephone. Shelly identified this boyfriend as Gary William Bultman. The defense counsel tried to question Shelly about her relationship with Bultman, but the prosecution objected on grounds that the defense had not disclosed who Bultman was. After hearing preliminary arguments by both parties outside the presence of the jury, the court recessed until the next afternoon to allow the parties to gather and present more evidence concerning Bultman. The next afternoon, following a hearing outside the presence of the jury, the trial court suppressed evidence of Bultman's past relationship with Shelly, concluding that the evidence failed to satisfy the foundational requirements necessary for admitting evidence of a third party's prior acts.

When the trial resumed, Shelly testified that, after returning to the house, she stayed in the living room for about 5 minutes and then went to the bedroom to get a diaper for Dominic. Within a few seconds, she heard a "thumping noise" coming from the living room. Shelly ran back into the living room and saw Williams standing over Genelda with a knife and something white in his hand. Shelly then saw Williams stab Genelda twice.

Shelly tried to pull Williams off Genelda, at which point Williams turned towards her and said, "I've been wanting to kill you for a long time." Shelly testified that Williams then came after her with the knife, eventually stabbing her twice, once in the back and once in the chest. At trial, the doctor who examined Shelly after the accident confirmed that Shelly had suffered two stab wounds that, if deeper, may have been life threatening.

Shelly testified that when Williams stabbed her the second time, the knife blade broke and Shelly tried to run out of the house. Williams grabbed Shelly by her sweatshirt, but Shelly slipped out of the shirt and ran outside. Williams followed and the two began struggling in the yard outside of Genelda's house.

Between 7:15 and 7:30 p.m. on January 12, a woman named DonnaJo Spangler drove by Genelda's house and saw a man and a woman fighting outside of the house. At trial, Spangler testified that the woman had no shirt on and was yelling, "He killed my grandma." According to Spangler's testimony, the man was saying, "Shut the fuck up. Shut the fuck up. I'll kill you, bitch." Spangler initially told the police that it appeared as though the woman was holding onto the man, trying to keep him from leaving, but at trial Spangler testified that the woman was trying to get away from the man. Spangler drove to a nearby Target store where she convinced an off-duty police officer to follow her back to the scene. At trial, Spangler identified Williams as the man involved in the fight.

According to Shelly, after Spangler drove off, Williams let her go, went back into the house, retrieved his shoes and jacket and left. Shelly then returned to the house, grabbed Dominic and her sweatshirt, and ran outside to get help. One of Genelda's neighbors testified that on the evening of January 12, she heard screaming from outside of her house, went outside to investigate and saw a woman standing in front of Genelda's house holding a baby and screaming, "Help. My Grandma." That neighbor then called police.

When the police arrived, Shelly told them that Williams had killed Genelda. A few blocks away, the police apprehended Williams. Police then drove Spangler, who had returned to Genelda's house with a police officer, to the scene of the apprehension where she identified Williams as the man she had seen attacking the woman. During Williams' arrest, officers observed what appeared to be blood on Williams' hands.

At approximately 9:00 p.m., an investigator from the Ramsey County Medical Examiner's Office examined Genelda's body and observed that the torso was warm and that very little rigor mortis had set in. This report, however, contradicted the observations of two officers on the scene, one of whom reported that Genelda's body was cold to the touch and the other of whom reported that some blood on Genelda's neck appeared to be dry.

An Assistant Ramsey County Medical Examiner later performed an autopsy on Genelda's body, but did not examine the body at the scene. From the investigator's report and from the autopsy, the medical examiner estimated that Genelda's death occurred between 7:00 and 8:00 p.m. on January 12, but admitted that she could not rule out earlier times. The medical examiner testified that Genelda had suffered 21 "sharp-force" injuries to her torso, neck, and head and that two of these injuries were fatal. The medical examiner concluded that Genelda's death was a homicide.

When they searched Genelda's house, the police found two portions of a broken knife blade in the kitchen and a knife handle wrapped in a white, man's athletic sock that appeared to have blood on it. The police also observed what appeared to be bloodstains in the kitchen, on the storm door, and on the back porch.

Upon booking Williams, the police photographed his hands but did not perform any tests to confirm that the substance on his hands was blood. Tests performed on Williams' clothes were negative for any signs of blood and, although tests confirmed the presence of small amounts of blood on the inside of William's shoes, the amounts were too small to provide conclusive DNA evidence as to the source of the blood. DNA tests did, however, indicate that blood samples taken from one of the portions of the

knife blade and the man's athletic sock were consistent with having come from Genelda. Samples taken from the bloodstain on the storm door were consistent with having come from Shelly. No samples were taken of or testing done on the apparent bloodstain on the porch, nor was the knife handle tested for fingerprints.

Prior to trial, Williams was placed in a cell with D.M.I., a felon with convictions for forgery and fraud. On several occasions, D.M.I. had served as a confidential informant to both local and federal law enforcement officials. At trial, D.M.I. testified that he befriended Williams and that Williams admitted to him that he had killed Genelda and attacked Shelly. D.M.I. testified that Williams subsequently offered him $1000 to kill Shelly so that she would not testify against Williams. D.M.I. contacted the police about Williams' offer and then began working with the police in a sting operation. The sting netted several recordings of telephone conversations between Williams and D.M.I. in which Williams made incriminating statements but did not expressly say that he had killed Genelda.

The jury found Williams guilty of one count of first-degree premeditated murder for killing Genelda and one count of attempted first-degree murder for attacking Shelly. The trial court sentenced Williams to life in prison for the murder and to a consecutive 180–month sentence for the attempted murder. On appeal, Williams argues that his convictions must be reversed because: (1) the trial court abused its discretion in suppressing evidence concerning Bultman's past relationship with Shelly; (2) the prosecution's failure to disclose evidence concerning Bultman to the defense violated the disclosure requirements of *Brady*, 373 U.S. 83, 83 S.Ct. 1194 and Minn. R.Crim. P. 9.01; (3) the trial court abused its discretion in admitting testimony about Williams' past acts of abuse towards Shelly; and (4) the trial court committed reversible error by seating a juror who, during voir dire, admitted that he tended to believe police officers more than other witnesses.

# I.

During cross-examination, the defense tried to question Shelly about her relationship with Gary William Bultman, the man whom Shelly had identified as the one who made repeated calls to Genelda's home on the day of the murder. The state, however, objected to that line of questioning and the court then heard each party's arguments outside the presence of the jury. The prosecution claimed that it had never heard the name Gary William Bultman. The defense responded that it had just learned of evidence the evening before—including police reports, a restraining order, and an interview between Genelda and an insurance agent—that showed that in October 1995 Bultman had threatened Shelly and Genelda. At the requests of the defense and prosecution, the court then ordered a recess until 3:00 p.m. the next day to give the parties time to examine the Bultman evidence and develop arguments concerning its admissibility.

The next afternoon, at a hearing outside the presence of the jury, the court summarized the defense's evidence linking Bultman with the Campeaus. The evidence provided by the defense included two Dakota County court files and various police reports concerning run-ins Bultman had with the Campeaus in 1995. The defense also provided a transcript of an interview between Genelda and an insurance agent concerning an incident in October 1995 in which Bultman broke into Genelda's home and threatened a friend of Shelly's. This evidence revealed that Bultman was Shelly's ex-boyfriend and had a history of abusing Shelly and harassing Genelda. The police and court records showed that in 1995 Shelly had applied for and received an order for protection against Bultman. Police and court records also showed that throughout the latter half of 1995, Bultman had harassed and threatened Genelda and Shelly, had vandalized their property, and had broken into Genelda's house and threatened a male friend of Shelly's. With respect to this last incident, Bultman had appeared in court to contest the charges on January 3, 1996 and was released on bail. On January 11, 1996, one day before Genelda's killing, a criminal complaint was issued against Bultman for a 1995 incident in which

he was observed peering into Genelda's windows; however, there was no evidence in the record that Bultman knew of that complaint. The defense asserted that this evidence tended to incriminate Bultman in the charged crimes and therefore was relevant to show that Williams did not commit the crimes.

■ The trial court suppressed this Bultman evidence, reasoning that the defense had not met the foundation requirements necessary to admit it. On appeal, we will only reverse the lower court's decisions concerning the admissibility of evidence if the court abused its discretion. *See State v. Gustafson,* 379 N.W.2d 81, 84 (Minn.1985).

■ We have long recognized that a criminal defendant should "have the right to show that crimes of a similar nature have been committed by some other person when the acts of such other person are so closely connected in point of time and method of operation as to cast doubt upon the identification of defendant as the person who committed the crime charged against him." *State v. Bock,* 229 Minn. 449, 458, 39 N.W.2d 887, 892 (1949). Accordingly, we have held that, pursuant to Minn. R. Evid. 404(b), "a *defendant* may seek to introduce evidence of other crimes or misconduct of a third person to prove that the *third person,* rather than the defendant, committed the crime." *State v. Johnson,* 568 N.W.2d 426, 433 (Minn.1997); *see generally State v. Spreigl,* 272 Minn. 488, 139 N.W.2d 167 (1965). To admit such "reverse-*Spreigl* " evidence, the defendant must show: (1) clear and convincing evidence that the third party participated in the reverse-*Spreigl* incident; (2) that the reverse-*Spreigl* incident is relevant and material to the defendant's case; (3) that the probative value of the reverse-*Spreigl* evidence outweighs its potential for unfair prejudice. *Johnson,* 568 N.W.2d at 433; *see also State v. Whittaker,* 568 N.W.2d 440, 449 (Minn.1997); *accord* Minn. R. Evid. 403, 404(b).

Here, neither side disputes that the numerous police reports and court documents detailing Bultman's acts of abuse towards Shelly and harassment towards Genelda provide clear and convincing evidence that Bultman was involved in the reverse-*Spreigl* incidents. Moreover, since the Bultman evi-

dence was being offered by the defense, there was little concern about it being unfairly prejudicial. Thus, the only factor at issue with respect to the Bultman evidence is whether it was sufficiently relevant and material to Williams' case.

In *Johnson* and *Whittaker* we addressed the relevancy issue by examining the similarities between the charged crime and the reverse-*Spreigl* crimes. *See Johnson,* 568 N.W.2d at 434; *Whittaker,* 568 N.W.2d at 449–50. In those cases, however, the defense alleged that the reverse-*Spreigl* crimes were so similar to the charged crimes that whoever committed one crime necessarily committed the other. *See Johnson,* 568 N.W.2d at 434; *Whittaker,* 568 N.W.2d at 449–50. In this case, Williams is not arguing that Bultman's ·prior acts of abuse were signature crimes. Rather, he asserts that the "several specific acts of abuse and harassment coupled with threats directed toward the victims of the crime that occurred in the months just before the murder and attack * * * show Bultman had the motive to commit the crime and the means to accomplish it (he'd engaged in physical attacks at the house before)."

■ We established the general guidelines for admitting such evidence in *State v. Hawkins,* 260 N.W.2d 150 (Minn.1977), where we recognized that:

> [p]roper foundation must be laid for the admission of such evidence * * * to avoid the consideration of matters collateral to the crime. "The rule is that (evidence of such acts) by a third person against the victim may not be shown unless coupled with other evidence having an inherent tendency to connect such other person with the actual commission of the crime." That is, evidence tending to incriminate another is inadmissible in the absence of proof of facts to connect that person with the crime. This requirement avoids the use of bare suspicion and safeguards the third person from indiscriminate use of past differences with the deceased.

*Id.* at 159 (citations omitted). Once the proper foundation evidence is laid, "it is permissible to introduce evidence of a motive of the third person to commit the crime, threats by

the third person, or other miscellaneous facts which would tend to prove the third person committed the act." *Id.* (footnotes omitted).

In cases in which we have upheld or required the admission of evidence of other bad acts by a third party, there always has been some direct evidence placing the third party at the scene of the charged crime. In *Hawkins,* for example, the third party was the only eyewitness to the crime and the prosecution's chief witness. *See id.* at 160. Likewise, in *State v. Anderson,* 379 N.W.2d 70 (Minn.1985), the evidence showed that a third party was present at the crime scene. *Id.* at 80. Here, while the Bultman evidence showed that Bultman had committed some incriminating acts in the past, it failed to connect Bultman to the scene of the charged crime on the date the charged crime occurred.

■ Also relevant to our analysis is evidence tending to exonerate the third party of the charged crimes. In *State v. Ashby,* 567 N.W.2d 21 (Minn.1997), for example, we affirmed the suppression of a third party's alleged admission to the charged crime because there was no physical evidence linking the third party to the crime and because an eyewitness testified that she was certain that the killer was not the third party. *Id.* at 26; *see also State v. Wilford,* 408 N.W.2d 577, 579–80 (Minn.1987) (holding that evidence of a third party's prior felonies was properly excluded, in part, because scientific evidence showed the defendant committed the charged crime). Similarly, in *State v. Harris,* 560 N.W.2d 672 (Minn.1997), we held that evidence that the accused third party had spoken to the victim on the night of the murder was insufficient to lay the required foundation where the third party had an alibi in the form of three witnesses who said the third party was with them on the night of the killing. *Id.* at 679–80; *see also Gustafson,* 379 N.W.2d at 84.

■ Applying those considerations to the present case, we are not persuaded that the trial court abused its discretion in excluding the Bultman evidence. While there was some evidence that Bultman may have placed telephone calls to Genelda's house on the day of the murder, Williams offered no evidence

placing Bultman at or near Genelda's house on the night of the murder. As the above summary of our case law indicates, evidence of the prior incriminating acts alone is not sufficient to establish the required *Hawkins* foundation. Moreover, there was substantial affirmative evidence that Bultman did not commit the charged crimes. Shelly, the only eyewitness to the killing, placed Williams, not Bultman, at the crime scene. Similarly, Spangler identified Williams, not Bultman, as the man fighting with and threatening to kill Shelly in Genelda's yard. Moreover, D.M.I. testified that Williams admitted to having committed the charged crimes. In light of the overwhelming eyewitness testimony linking Williams to the charged crimes, Williams' failure to provide any evidence linking Bultman to Genelda's house on the night of the killing is fatal to his claim. The Bultman evidence simply does not cast doubt upon the identification of Williams as the person who committed the crime charged against him. Accordingly, we hold that the trial court did not abuse its discretion in suppressing the Bultman evidence.

## II.

■ Williams next argues that, even if the trial court did not err in suppressing the Bultman evidence, Williams' convictions must be reversed because the state failed to disclose the Bultman evidence prior to trial.

■ In *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), the United States Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused * * * violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Id.* at 87, 83 S.Ct. 1194. Thus, in criminal cases, the state has an affirmative duty to disclose evidence that is favorable and material to the defense. *Id.; see also Kyles v. Whitley,* 514 U.S. 419, 432, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995).

■ The state asserts that *Brady* should not apply in this case because the prosecutors trying the case did not know of the Bultman evidence until the defense counsel

brought it up during Shelly's cross examination. However, whether the prosecutors actually knew of the Bultman evidence is not dispositive for *Brady* purposes. *See Kyles,* 514 U.S. at 437, 115 S.Ct. 1555. Rather, "the individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police." *Id.* Regardless of whether the prosecution succeeds in this duty, the state's duty to disclose material, favorable evidence is "inescapable." *Id.* at 437–38, 115 S.Ct. 1555. Minnesota's Rules of Criminal Procedure similarly obligate prosecutors to disclose material exculpatory information "in the possession or control of * * * the prosecution staff and of any others who have participated in the investigation * * * of the case and who either regularly report or with reference to the particular case have reported to the prosecuting attorney's office." Minn. R.Crim. P. 9.01, subd. 1(7).

Here, the police, including some of the same investigators working on this case, knew of Bultman's past acts of abuse towards the Campeaus. Moreover, several of Bultman's past acts of abuse were documented with the Ramsey County Attorney. Thus, if the Bultman evidence was material to Williams' guilt, the prosecutors had a duty to disclose it.

The United States Supreme Court has held that "favorable evidence is material * * * 'if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.'" *Kyles,* 514 U.S. at 433–34, 115 S.Ct. 1555 (quoting *United States v. Bagley,* 473 U.S. 667, 682, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985)). "A 'reasonable probability' of a different result is accordingly shown when the government's evidentiary suppression 'undermines confidence in the outcome of the trial.'" *Id.* at 434, 115 S.Ct. 1555 (quoting *Bagley,* 473 U.S. at 678, 105 S.Ct. 3375).

In our foregoing analysis of the trial court's suppression of the Bultman evidence we held that, because of a lack of foundation evidence, the Bultman evidence was not material and relevant to the state's claim and its suppression was not error. That same anal-

ysis holds true with respect to analyzing the materiality of the evidence for *Brady* purposes. Nothing in the Bultman evidence itself exonerates Williams, nothing directly impeaches or contradicts the testimony of any of the state's witnesses, and Williams failed to provide any evidence linking Bultman to the charged crimes. Moreover, the conclusions that Williams asks us to draw from the Bultman evidence – that Bultman, not Williams, killed Genelda and attacked Shelly – are mere speculation and contradict the sworn testimony of at least three witnesses. Given the collateral and speculative nature of this evidence, the prosecution's failure to disclose it does not undermine our confidence in the outcome of Williams' trial.

 Williams, however, argues that even if the Bultman evidence itself was not material, the prosecution's failure to timely disclose that evidence was material in that it precluded the defense from further investigation based on the Bultman evidence and deprived the defense of the opportunity to adequately incorporate that evidence into Williams' defense. Williams correctly points out that in analyzing the materiality of the undisclosed favorable evidence:

> the reviewing court may consider directly any adverse effect that the prosecutor's failure to [disclose] might have had on the preparation or presentation of the defendant's case. The reviewing court should assess the possibility that such effect might have occurred in light of the totality of the circumstances and with an awareness of the difficulty of reconstructing in a post-trial proceeding the course that the defense and the trial would have taken had the defense not been mislead by the prosecutor's [non-disclosure].

*Bagley,* 473 U.S. at 683, 105 S.Ct. 3375.

After reviewing the record, however, we find no merit to Williams' claim that the prosecution's failure to timely disclose the Bultman evidence had material consequences on the defense's ability to investigate or prepare for its case. Nothing the prosecution did prevented the defense from questioning known witnesses about the possibility that a third party may have participated in the killing. Indeed, the theory that a person

other than Williams committed the crimes was the defense's theory of the case throughout trial.

Moreover, the defense knew of Bultman's relationship with the Campeaus prior to trial. The defense had been given and had reviewed grand jury transcripts and police reports indicating that Shelly said that "Bill" had repeatedly called Genelda's house on the day of the killing. The defense, however, chose not to investigate who "Bill" was until after the jury had been seated. The week before Shelly was to testify, a defense investigator requested and subsequently obtained police records and insurance information concerning Bultman's actions towards the Campeaus. While the defense counsel claimed he was not made aware of the contents of those reports until the evening before Shelly testified, by the time he cross-examined Shelly he knew the highlights of Bultman's relationship with Shelly and Genelda.

In addition, at the defense's request, the court granted the parties a day to fully review the Bultman evidence and prepare arguments as to its admissibility. The defense never indicated that additional time was needed to further investigate the Bultman evidence. In ruling the Bultman evidence inadmissible, the trial court also stated that if additional evidence adding validity to the defense's claim that Bultman killed Genelda came to light, the court would reconsider its ruling. No such evidence was ever offered. Accordingly, we hold that neither the Bultman evidence itself nor the state's failure to timely disclose it were material to Williams' case and, thus, the state's failure to disclose the evidence was not reversible error.

### III.

Williams' third claim of error concerns the trial court's admission of testimony relating to Williams' past acts of abuse against Shelly. Specifically, Williams alleges that the abuse was too dated to have significant relevance and that the introduction of the evidence through multiple witnesses was unfairly prejudicial. Again, we generally defer to the trial court's exercise of discretion in evidentiary matters of this nature and will only reverse a trial court's decisions concerning evidentiary matters where there has been a clear abuse of discretion. *See Gustafson,* 379 N.W.2d at 84; *State v. Kelly,* 435 N.W.2d 807, 813 (Minn.1989).

Evidence of a defendant's past abuse of a victim is not admissible to prove character in order to show that the defendant acted in conformity with that character, but may be admissible to show " 'motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.' " *State v. Buggs,* 581 N.W.2d 329, 336 (Minn.1998) (quoting Minn. R. Evid. 404(b)). For such evidence to be admissible, the state must provide clear and convincing evidence that the defendant committed the prior bad acts and must show that the probative value of the evidence is not outweighed by its potential for unfair prejudice. *See id.;* Minn. R. Evid. 403.

Here, the evidence that Williams committed the prior bad acts was clear and convincing. Williams' involvement in the past acts of abuse against Shelly was confirmed by police reports and eyewitness testimony.

As for probative value of the evidence, we have on numerous occasions recognized the inherent value of evidence of past acts of violence committed by the same defendant against the same victim. In *State v. Volstad,* 287 N.W.2d 660 (Minn.1980), for example, we stated that evidence of prior assaults against the victim by the defendant may be "properly admitted for the purpose of illuminating the relationship of defendant and complainant and placing the incident with which defendant was charged in proper context." *Id.* at 662. Similarly, in *State v. Mills,* 562 N.W.2d 276 (Minn.1997), we recognized that "[c]haracter evidence which tends to show the 'strained relationship' between the accused and the victim is relevant to establishing motive and intent and is therefore admissible." *Id.* at 285 (citing *State v. Flores,* 418 N.W.2d 150, 159 (Minn.1988); *State v. Blanchard,* 315 N.W.2d 427, 431 (Minn. 1982)).[1]

---

1. The relevance of such evidence is also acknowl- edged by Minn.Stat. § 634.20 (1998).

The timing of Williams' prior acts does not necessarily detract from the evidence's relevance. In *State v. Bolte*, 530 N.W.2d 191 (Minn.1995), we recognized that " '[o]lder' offenses sometimes are relevant, sometimes not." *Id.* at 198 (citation and internal quotations omitted). In *Mills*, we affirmed the admission of an act that occurred over eight years prior to the charged crime. 562 N.W.2d at 285. Here, even though Williams' acts of abuse occurred more than a year before the killing, evidence of those acts was still relevant to provide the jury with a full understanding of the nature of Williams' and Shelly's relationship.

With respect to the potential prejudice of this evidence, Williams argues that the cumulative effect of allowing multiple witnesses to testify about his abuse of Shelly rendered the evidence unfairly prejudicial. However, the defense was informed before trial that the evidence of Williams' abuse would be admitted via multiple witnesses, yet made no objection to the manner in which the evidence came in. Moreover, the linchpin of the defense's case was to undermine Shelly's credibility. The defense's attacks on Shelly's honesty may have reasonably necessitated the state's confirmation of Williams' abuse through other witnesses.

 We note that the trial court gave no limiting instructions as to the proper use of the evidence of William's past abuse, either prior to or after the admission of that evidence. We have recognized that giving such instructions both before and after 404(b) evidence is introduced helps ensure that the jury uses the evidence only for the permissible purposes espoused in Rule 404(b) or our case law, and not to convict the defendant on the basis of the prior bad acts. *See Buggs*, 581 N.W.2d at 336; *State v. Frisinger*, 484 N.W.2d 27, 31 (Minn.1992.) However, in the present case, the defense never requested limiting instructions. While a trial court should generally still provide such instructions *sua sponte* to ensure that the 404(b) evidence is not used for an improper purpose, the failure to provide limiting instructions absent a request is not reversible error. *Frisinger*, 484 N.W.2d at 31. Moreover, although the failure to give limiting instruc-

tions in certain circumstances may constitute plain error, we hold that it does not do so in this case.

Here, even without limiting instructions, there were several factors reducing the 404(b) evidence's potential for unfair prejudice. Witnesses testified that Williams had committed no acts of abuse in the year prior to the killing and that Shelly, Genelda, and Williams had gotten along during this period. This testimony helped put Williams' past abuse into context. Moreover, at the defense's request, the trial court did provide the jury with *Spreigl* limiting instructions regarding the admission of D.M.I.'s testimony about Williams' alleged attempt to have Shelly killed. These instructions were given both prior to D.M.I.'s testimony and at the close of trial. In addition to specifically cautioning the jury against improper use of D.M.I.'s testimony, they provided a more general admonition that Williams was "not to be convicted for any crimes other than the crimes charged in the indictment." Given these factors, the probative value of the evidence of William's past abuse was not outweighed by its potential for unfair prejudice. Accordingly, we hold that the trial court did not abuse its discretion in admitting the evidence.

## IV.

 Williams' final argument is that his conviction must be reversed because the trial court seated a juror, D.W.F., who during *voir dire* had answered "yes" when asked if he "would tend to believe a police officer either more or less than any other witness." Williams argues that this case is analogous to *State v. Logan*, 535 N.W.2d 320 (Minn.1995), where we reversed a conviction because the trial court had seated a juror who had admitted bias towards police. *Id.* at 323–24.

 Minnesota Rule of Criminal Procedure 26.02, subdivision 5(1), lists the ground on which a juror may be challenged for cause, including: "[t]he existence of a state of mind on the part of the juror, in reference to the case or to either party, which satisfies the court that the juror cannot try the case impartially and without prejudice to the substantial rights of the party challenging."

Generally, a court's decision regarding a juror's claims of impartiality or bias "is entitled to 'special deference' because 'the determination is essentially one of credibility, and therefore largely one of demeanor.'" *Logan,* 535 N.W.2d at 323 (quoting *Patton v. Yount,* 467 U.S. 1025, 1037–38, 104 S.Ct. 2885, 81 L.Ed.2d 847 (1984)). However, in challenging the seating of a juror, the appellant need only show that the juror was biased, not that the bias resulted in actual prejudice. *Id.* at 324. Accordingly, "when it has been shown that those charged with bringing a defendant to judgment lack objectivity, 'a reviewing court can neither indulge a presumption of regularity nor evaluate the resulting harm.'" *Id.* (quoting *Vasquez v. Hillery,* 474 U.S. 254, 263–64, 106 S.Ct. 617, 88 L.Ed.2d 598 (1986)).

In *Logan* we held that the trial court committed reversible error in seating a juror who had admitted bias in favor of police officers. *Id.* There, the juror indicated during *voir dire* that he thought it would be "virtually impossible for [him] to conclude as a juror that a police officer had testified falsely in this case." *Id.* at 322. In seeking to rehabilitate that juror, the prosecution asked "a series of leading questions, the answers to which indicated that [the juror] would follow the instructions of the court to the best of his ability." *Id.* On further questioning by the defense counsel, however, the juror stated:

> I'm not to the point of saying that I would take [police] testimony or what they say as the number one priority, but I happen to respect their work and what they do.
>
> \* \* \* \* \* \*
>
> I do feel that I'm going to favor in some way, shape or form what they do because that's how I feel.

*Id.* at 323.

The facts of the present case are not analogous to *Logan.* Here, while D.W.F. did state on the *voir dire* questionnaire that he would tend to believe police officers more than oth-

er witnesses, his testimony during *voir dire* negates claims that he lacked objectivity. Unlike the juror in *Logan,* D.W.F. never stated unequivocally that he was biased towards police officers. Moreover, in response to questions *by the defense counsel,* D.W.F. made the following statements:

> Q: Okay. So, in other words, you wouldn't treat a police officer any differently –
>
> A: No.
>
> Q: —than an eyewitness just because they were a police officer?
>
> A: No, I wouldn't.
>
> Q: And if you listen to a police officer, and you didn't think that his testimony was worthy of belief, you could reject it?
>
> A: Yes, I could.
>
> Q: And the same as you would any other witness?
>
> A: Uh-huh.
>
> Q: On the other hand, if you thought the police officer's testimony was pretty credible, you could accept it?
>
> A: Uh-huh.
>
> Q: Okay. But not because he was a police officer?
>
> A: No, not necessarily, no.
>
> Q: Is that correct?
>
> A: No, I would have to listen to the facts.

In responding to further defense questions, D.W.F. stated under oath that he could listen to the evidence presented at trial, could keep an open mind, and, if the evidence did not prove the state's case, could return a verdict of not guilty. Following this questioning, the defense counsel, rather than object or renew his objection for cause[2] or use his remaining preemptory challenge, expressly accepted the juror. Based on this evidence, we hold that Williams failed to establish that D.W.F. was biased.

Moreover, the transcripts of the *voir dire* examination indicate that the trial court was

2. The record contains some discrepancy with respect to whether the defense ever actually moved to dismiss D.W.F. for cause. The transcript of the *voir dire* proceeding does not indicate that the defense counsel ever made such a motion, but does state that, after the defense counsel questioned D.W.F. regarding his statement about police officers, the prosecutor objected to "that motion" and the trial court denied "the motion." Our analysis and holding is the same regardless of whether the defense actually moved to dismiss D.W.F. for cause.

properly sensitive to the issue of police bias. While the court had denied several challenges for cause based on police bias, in each instance the prospective juror was sufficiently rehabilitated by subsequent questioning. Further, in response to the defense's challenges for cause, the court excused five potential jurors for police bias. Thus, neither the statements of the challenged juror nor the actions of the trial court in the *voir dire* process support Williams' argument that the trial court impermissibly seated a biased juror. Accordingly, we hold that the seating of D.W.F. was not reversible error.

Affirmed.