STATE OF MINNESOTA

IN SUPREME COURT

A23-0851

Ramsey County

Edbert Neal Williams,

Appellant,

vs.

State of Minnesota,

Respondent.

Anderson, J.
Took no part, Thissen, J.

Filed: April 24, 2024
Office of Appellate Courts

———————————————

Zachary A. Longsdorf, Longsdorf Law Firm, PLC, Inver Grove Heights, Minnesota, for appellant.

Keith Ellison, Attorney General, Saint Paul, Minnesota; and

John J. Choi, Ramsey County Attorney, Alexandra Meyer, Assistant Ramsey County Attorney, Saint Paul, Minnesota, for respondent.

———————————————

S Y L L A B U S

1.    The district court did not abuse its discretion by denying the appellant's petition for postconviction relief because the petition was time-barred, and the evidence proffered under the newly-discovered-evidence exception failed to establish, by a clear and convincing standard, that the appellant is innocent.

1

2. The district court did not abuse its discretion by denying the petition for postconviction relief because appellant did not establish that the interests of justice require a new trial.

Affirmed.

## O P I N I O N

ANDERSON, Justice.

Appellant Edbert Neal Williams was convicted of first-degree murder and first-degree attempted murder in the death of Genelda Campeau and the attack on her adult granddaughter, S.C. Williams was sentenced to life in prison for murder and received a 180-month consecutive sentence for attempted murder. He appealed, and we affirmed his convictions. *State v. Williams* (*Williams I*), 593 N.W.2d 227 (Minn. 1999).

In this postconviction proceeding, Williams seeks a new trial or an evidentiary hearing based on new DNA evidence not available at the time of trial. Williams asserts the DNA evidence exonerates him and implicates an alternative perpetrator. Williams, whose postconviction petition was summarily rejected by the district court, claims that his appeal satisfies either the newly-discovered-evidence or the interests-of-justice exceptions to the 2-year time limit for postconviction relief petitions established in Minnesota Statutes section 590.01, subdivisions 4(b)(2) and 4(b)(5) (2022). The State counters that the evidence does not satisfy the newly-discovered-evidence exception because it is not exculpatory and that Williams did not establish that the interests of justice require a new trial.

Because we agree with the State that Williams has not met the clear and convincing standard required to satisfy the newly-discovered-evidence exception, and because Williams cannot show that the interests of justice require a new trial, we affirm.

**FACTS**

The facts underlying the crime are fully set out in our decision in the original appeal. *See Williams I*, 593 N.W.2d at 229–32. To briefly summarize as relevant to this postconviction proceeding: in January 1996, Genelda Campeau and her granddaughter, S.C., were attacked and stabbed at Genelda's home;[1] Genelda died, but S.C. survived. Edbert Neal Williams was S.C.'s former boyfriend and the two shared a child together. Williams had visited the Campeau household that night to see his child with S.C. S.C. claimed that Williams had visited earlier in the day, returned, and then became increasingly agitated and threatened to take the child away from the home. Williams stabbed Genelda when S.C. was briefly in another room; S.C. returned and witnessed Williams continuing his attack. S.C. testified Williams then stabbed her. A passerby observed S.C. in a struggle with Williams outside Genelda's home and heard S.C. yelling that Williams had killed Genelda. The witness also testified to hearing Williams threaten to kill S.C.

The limited forensic testing available in 1996 confirmed only that Genelda's DNA was found in the blood spatter samples from two items police found in the kitchen of Genelda's home: a broken knife blade and a man's athletic sock containing the knife handle. These items, however—the ostensible murder weapon—could not be linked to

---

[1] Consistent with *Williams I* and to avoid confusion with S.C., we will refer to the grandmother by her first name.

Williams through forensic evidence. Although police photographed a blood-like substance on Williams's hands when he was apprehended in a nearby alleyway on the night of the crime, no DNA testing was performed on this substance.

Based on the testimony of S.C., the passerby, and a jailhouse informant who stated that Williams had confessed his guilt to him, Williams was found guilty by a jury and convicted. Williams filed multiple postconviction relief petitions. In 2005, the first of these petitions reached our court. The jailhouse informant who testified that Williams had confessed to the murder provided an affidavit recanting his trial testimony and alleging a conspiracy to frame Williams, but then recanted that affidavit, claiming that he had only disavowed his trial testimony due to threats from fellow prisoners. *Williams v. State* (*Williams II*), 692 N.W.2d 893, 895 (Minn. 2005). We affirmed the denial of this first postconviction petition because assertions in the affidavit were grounded on hearsay evidence and because, setting aside issues regarding the reliability of the informant's testimony or his recantations, his testimony in the original trial was not essential to the conviction. *Id.* at 896–97. The eyewitness testimony of two witnesses, S.C. (who identified Williams as the person who stabbed her) and the passerby, as well as the lack of evidence of an alternative perpetrator, supported the denial of the petition for postconviction relief.

Williams filed a second postconviction petition that reached our court in 2015. In that petition, he alleged multiple grounds for relief and, as relevant here, ineffective assistance of trial and appellate counsel because both attorneys failed to sufficiently pursue an alternative-perpetrator defense. *Williams v. State* (*Williams III*), 869 N.W.2d 316,

4

317–18 (Minn. 2015). We concluded that those claims were barred because they were known to Williams but not raised in earlier proceedings. *Id.*; *see also State v. Knaffla*, 243 N.W.2d 737 (Minn. 1976). We also rejected his claim that mental illness prevented him from timely making his claims, concluding that he was sufficiently competent to pursue multiple prior appeals and petitions, and rejected his claim that the interests of justice also justified disregarding the *Knaffla* bar. *Williams III*, 869 N.W.2d at 319.

In 2019, Williams filed a motion under Minnesota Statutes section 590.01, subdivision 1a (2022), seeking forensic testing of evidence from the 1996 crime scene. Although DNA testing at the time of trial was unable to connect the DNA evidence to a perpetrator, advances in contemporary DNA testing meant that the limited samples available were now sufficient to yield more definitive results. The district court granted the motion, and the Bureau of Criminal Apprehension ("BCA") analyzed evidence that it had retained from the crime scene, including the knife blade, the sock that contained the handle of the knife, and the shoes Williams wore on the night of the crime. The BCA released three reports in August 2020, September 2020, and November 2022, and a private lab Williams hired released one report in October 2022. Williams asserts that these reports corroborate his claims that he was not at the scene of the crime when it occurred and that an alternative perpetrator killed Genelda.

*August 2020 BCA Report*

The August 2020 BCA report included results from the BCA's DNA testing and analysis of the knife blade, two samples taken from Williams's shoes,[2] and two samples taken from the sock.[3]   The knife blade did not have sufficient genetic information to generate results at the time of testing.

The first shoe sample contained a mixture of DNA from three or more individuals from which S.C. was excluded as a contributor, but Genelda and Williams could not be excluded.   The second shoe sample contained a mixture of DNA from three or more individuals, with a major profile match for Genelda, not S.C. or Williams.  But the mixture contained insufficient genetic information for further analysis of the minor profiles.

Two samples from the sock were tested and each contained a mixture of DNA from two or more individuals.  The major profile matched Genelda, not S.C. or Williams.  There was insufficient genetic information to analyze other contributors to the DNA mixture beyond the major profile.  The BCA also did Y-chromosomal DNA analysis.[4]   While Y-chromosomal DNA from the sock samples showed that Williams was not a match for the *major* Y-chromosomal profile, at the time the BCA did not have an approved method of testing *minor* Y-chromosomal DNA profiles.  Therefore, although the BCA concluded

---

[2]    The two samples taken from the shoes Williams was wearing on the day of the murder were labeled 6-1 and 6-2 by the BCA.

[3]    The two 1996 samples taken from the sock that contained the knife handle were labeled 11-1 and 11-2 by the BCA.

[4]    Y-chromosomal DNA analysis, as implied by its name, specifically identifies male contributors to traces of DNA.

the major male DNA profile on the sock did not match Williams, it was unable to test whether his DNA matched the minor profiles.

*September 2020 BCA Report*

Additional testing by the BCA in September 2020 included a third, new sample taken from the sock.[5] This third sample contained a mixture of DNA from four or more individuals, and Genelda and Williams could not be excluded as contributors. Although Y-chromosome testing showed a mixture of DNA from three or more male individuals, no further analysis of the contributors to the Y-chromosomal mixture of DNA was possible, consistent with the August 2020 report.

Williams, noting the presence of unidentified male DNA profiles on the sock sample, sought to connect the evidence to S.C.'s boyfriend at the time of the crimes: G.B. At trial, Williams had sought to question S.C. about her relationship with G.B. and to implicate him. *Williams I*, 593 N.W.2d at 232. But at the time of trial, Williams was unable to pursue the alternative-perpetrator theory focusing on G.B. because no evidence connected G.B. to the crime scene. *Id.* at 232–33. As part of the proceedings connected to Williams's present petition, G.B. was asked to provide a DNA sample; he declined to do so. G.B. was also identified by the recanted affidavit in *Williams II* as the guilty party in S.C.'s stabbing and Genelda's death. 692 N.W.2d at 895–96.

---

[5]     The new sample taken from the sock was labeled 11-A by the BCA.

*October 2022 Private Lab Report*

In October 2022, a private lab retained by Williams analyzed test data only from the knife blade and the second sock sample. The private lab's analysis showed that these two samples were highly unlikely to contain DNA from Williams.

*November 2022 BCA Report*

The State then requested that the BCA re-examine its 2020 report data. The BCA finished its report in November 2022, and it examined a wider swath of evidence than the private lab. It not only re-analyzed the same samples as the private lab—the knife blade and the second sock sample—but also re-analyzed the shoe samples and all the sock samples. As in the 2020 tests, the knife blade did not contain sufficient genetic information to generate results at that time.

Analysis of the first shoe sample yielded new results. The BCA determined that the sample had potentially been contaminated by a BCA employee in 1996, explaining the inconclusive initial test results in August 2020. But the second shoe sample yielded results consistent with the 2020 report; it contained a mixture of DNA from three or more individuals with a major DNA profile matching Genelda. The BCA was able to analyze the minor profiles, which was beyond the capabilities of the BCA in 2020. As a result, the BCA identified Williams as a potential contributor to the DNA mixture gathered from the second shoe sample.

The first sock sample contained one female DNA profile matching Genelda, like the 2020 results. Consistent with the 2020 results, the second sock sample contained a mixture of DNA from two or more individuals, and the major female profile again matched

8

Genelda. Like the 2020 analysis, due to insufficient genetic information, no conclusion could be made concerning an additional male contributor present in the DNA mixture. Put another way, neither the private DNA testing conducted by Williams, nor the BCA DNA testing, linked the second sock sample to Williams.

But new testing by the BCA on the third sock sample yielded results adverse to the claims of innocence by Williams. The third sock sample (tested for the first time as part of these postconviction proceedings, 24 years after the trial) was determined to contain a mixture of DNA from four individuals. The BCA concluded that neither Genelda nor Williams could be excluded as contributors. In addition, the BCA noted that "[t]he probability of observing this DNA profile is 56 thousand times more likely if Edbert Neal Williams and three unknown, unrelated individuals are the source than if four unknown, unrelated individuals are the source." It also concluded that "[t]he probability of observing this DNA profile is greater than 100 billion times more likely if Genelda L. Campeau, Edbert Neal Williams, and two unknown, unrelated individuals are the source than if four unknown, unrelated individuals are the source."

Despite the 2022 BCA analysis both identifying Genelda's DNA on Williams's shoe and pointing to Williams as a contributor to the DNA mixture found on the sock, Williams filed a petition for postconviction relief. Williams argued, based on the 2020 BCA reports and the private lab report, that he could be excluded as a contributor to the DNA found on the socks and that S.C. was excluded as a contributor to DNA on the knife that she testified was used to stab her. The district court summarily denied his petition. The court concluded that Williams's petition was barred by the 2-year time limit for postconviction relief

9

petitions set out in Minnesota Statutes section 590.01, subdivision 4(a) (2022), and that neither the newly-discovered-evidence exception nor the interests-of-justice exception to the time bar applied.

The newly-discovered-evidence exception requires that evidence proffered in a postconviction relief petition establish "by a clear and convincing standard" that the petitioner is innocent, and the district court concluded that Williams failed to establish his innocence. Minn. Stat. § 590.01, subd. 4(b)(2). Additionally, if Williams did meet that standard, the court held he would still have to meet the test established by our court in *Rainer v. State*, which, among other things, requires new evidence to "probably produce an acquittal or a more favorable result." 566 N.W.2d 692, 695 (Minn. 1997). According to the district court, Williams also failed the *Rainer* test.

The interests-of-justice exception permits an otherwise time-barred postconviction relief petition to be granted when "the petitioner establishes to the satisfaction of the court that the petition is not frivolous and is in the interests of justice." Minn. Stat. § 590.01, subd. 4(b)(5). Williams claimed that his history of mental illness, resulting in periods of involuntary commitment, in addition to findings that he lacked the capacity to make decisions regarding his use of medications, satisfied the interests-of-justice requirements. But the district court, citing *Williams III*, noted that similar arguments had previously been rejected. In *Williams III*, Williams claimed he had been unable to raise an ineffective-assistance-of-counsel claim in his first petition in 2003 because of mental illness. *Williams III*, 869 N.W.2d at 319. And here, similarly, Williams had demonstrated

in the past his ability to file direct appeals and multiple petitions for postconviction relief, thus leading to the district court rejecting his mental illness argument.

Williams now argues that the district court erred by summarily rejecting his petition for postconviction relief. In particular, he claims that the court erred by (1) finding that the new evidence he presents with his petition does not prove, by a clear and convincing standard, that he is innocent of the murder of Genelda Campeau and attempted murder of S.C., and (2) rejecting his argument that he is entitled to relief based on his petition in the interests of justice because of his history of mental illness.

## ANALYSIS

"This court reviews a district court's summary denial of a postconviction petition for an abuse of discretion." *Munt v. State*, 984 N.W.2d 242, 249 (Minn. 2023). Both parties agree that Williams must meet one of the two exceptions to the 2-year time bar for postconviction proceedings—for newly discovered evidence or in the interests of justice. Both parties also agree that Williams acted within 2 years after receiving the additional testing results.

I.

We turn first to the claim of Williams that newly discovered evidence establishes that he is innocent, and that this evidence meets the clear and convincing standard required by the postconviction statute. For the reasons noted below, we are not persuaded on either score.

To prevail under the newly-discovered-evidence provision in subdivision 4(b)(2), Williams must (1) allege the existence of newly discovered evidence that (2) could not

11

have been discovered through due diligence by the petitioner or the petitioner's attorney within the 2-year postconviction petition time limit, (3) is not cumulative to evidence presented at trial, (4) is not for impeachment purposes, and (5) establishes "by a clear and convincing standard" that he is innocent of the offenses for which he was convicted. Minn. Stat. § 590.01, subd. 4(b)(2).

Both parties agree that the DNA reports meet the first four requirements but dispute whether the "clear and convincing" exoneration requirement is met here. Our case law establishes that the new evidence should "render[] it more likely than not that no reasonable jury would convict." *Riley v. State*, 819 N.W.2d 162, 170 (Minn. 2012). We must also accept the evidence the petitioner presents, evaluating then whether the evidence "demonstrate[s] the petitioner's innocence by a clear and convincing standard." *Henderson v. State*, 906 N.W.2d 501, 507 (Minn. 2018). To determine whether the district court erred in summarily dismissing the postconviction petition, we are not free to judge either the credibility or the methodology of these reports. *Id.* We need not, however, accept the interpretation of the report offered by Williams or his preferred narrative of the events that he claims is supported by the reports. *See id.* at 508.

The evidence advanced by Williams falls well short of establishing error on the part of the district court in summarily dismissing the petition. Williams relies here, in part, upon the factual allegations contained in the recanted affidavit of *Williams II* despite our determination that the affidavit was no longer credible. *See Williams II*, 692 N.W.2d at 897. As to the DNA evidence, the private lab report indicates that the second sock sample does not contain his DNA. It also excludes him as a contributor to the knife blade. But,

12

critically, DNA evidence from those items was not used to convict him in 1996—the science of DNA had not advanced sufficiently at that time to report meaningful results on these tested items. More importantly, Williams does not explain why, if he is guilty, we should expect his DNA to be present. Put another way, assuming that he did in fact hold the knife handle found in the sock and stab the victims, he offers no explanation as to why the *absence* of *his* DNA is clear and convincing evidence of his innocence. No testimony ever showed that Williams was cut by the blade. And he advances no reason as to why the absence of his DNA on the knife blade is significant, given that a knife is not generally held by the blade.

Additionally, with the context provided by the reports from the BCA, we can see that Williams is not fully exonerated as a contributor of important DNA evidence. The BCA (as well as the private lab) found Genelda's DNA on the second sock sample. The BCA could not exclude Genelda *or Williams* as contributors to the DNA mixture from the third sock sample—and the BCA report shows, in fact, that Williams probably did leave DNA on the sock holding the likely murder weapon. Furthermore, the discovery of Genelda's DNA on Williams's shoes undercuts the credibility of his petition for postconviction relief, and particularly so, given his repeated claims that he only arrived at the home after Genelda was killed. He does not explain why her DNA would be on the shoes that he wore in the Campeau household. Importantly, this is entirely new evidence incriminating Williams because this evidence was not possible to analyze in 1996. Rather than bolstering the claim of innocence, the new DNA evidence provides some additional support for the jury verdict that Williams was guilty of the charge of murder.

13

Williams makes much of the fact that the DNA of other males is present on the sock discovered at the crime scene. The police, in the 1996 investigation, were unable to trace the origins of the sock and failed to find a match in Williams's home. As the State notes, with a sock of unknown provenance, it is impossible to identify with any certainty the origins of any unidentified DNA. Williams additionally claims that, because the August 2020 BCA report mentions testing of "the blood previously indicated on" the samples, the DNA analysis must have come from blood left on the sock. The report does not so state and, additionally, the subsequent 2022 report only mentions blood as analyzed on the knife blade, and the rest of the items are not indicated as having blood residue. These potential inconsistencies do not establish what Williams claims here—that "unknown male DNA" on the socks must be blood from other men at the crime scene. Williams also does not explain why the probable murderer would have left his blood on the sock holding the knife when, again, no testimony claims that the assailant left his blood on either the knife or the sock.

More importantly, the BCA report from 2022 states that Williams cannot, in fact, be excluded as a contributor to the DNA mixture from the third sock sample. Williams, who we now know had Genelda's DNA on one of his shoes that were at the crime scene, may very well have touched the sock holding the murder weapon based on the results from the third sock sample. None of this information was known or available in 1996.

None of the additional testing meets the clear and convincing standard for newly discovered evidence and, in fact, some of the additional testing points towards Williams as the perpetrator rather than excludes him. Beyond the DNA evidence presented here,

14

however, the testimony of two witnesses, S.C. and the passerby who witnessed S.C. fighting with Williams and also testified that Williams threatened to kill S.C. directly, identifies Williams as present on the scene and a participant in the murder and attempted murder.

Williams also argues that the district court misapplied the requirements of the newly-discovered-evidence exception because the court did not accept his theories, based on the DNA reports, of what transpired when Genelda was killed and S.C. was seriously wounded; in other words, the district court erred because it did not accept the inferences he drew from the reports. But as we stated in *Henderson*, a district court must accept *the evidence* as true when summarily denying relief. 906 N.W.2d at 506–07. What Williams claims in addition to the evidence supplied, however, is not evidence itself; the court need only weigh whatever factual allegations the petitioner makes with all other available evidence to determine whether the petitioner has demonstrated innocence by a clear and convincing standard. *Id.* at 508. Williams cites to *Ferguson v. State*, 645 N.W.2d 437, 446 (Minn. 2002), to bolster his argument. That decision, however, refers to the *Larrison* test, dealing with recantation of trial testimony and evidence required to meet that test when seeking a new trial, or to newly discovered evidence of false trial testimony. *See Tichich v. State*, 4 N.W.3d 114, 120–121 (Minn. 2024). It therefore is of no help to him.[6]

---

[6] The *Larrison* test, derived from *Larrison v. United States*, 24 F.2d 82, 87–88 (7th Cir. 1928), *overruled by United States v. Mitrione*, 357 F.3d 712, 718 (7th Cir. 2004), is a three-prong test used "to determine whether a petition for postconviction relief warrants a new trial based on recantation of trial testimony." *State v. Turnage*, 729 N.W.2d 593, 597 (Minn. 2007). The court must be "reasonably well-satisfied" that (1) a material witness

Even if we accept the possibility that some of the new test results are ambiguous or unclear, or even marginally beneficial to Williams, none of those results demonstrate, by a clear and convincing standard, that he is innocent in the murder of Genelda and attempted murder of S.C.[7] He therefore cannot meet the requirement of the newly-discovered-evidence exception, and accordingly is not entitled to the 2-year time bar exception provided by section 590.01, subdivision 4(b)(2). As a result, the district court did not abuse its discretion in summarily denying Williams's postconviction petition.

## II.

Williams also claims he is entitled to relief based on the interests-of-justice exception because his mental illness prevented him from timely filing his petition.

This exception, found in Minnesota Statutes section 590.01, subdivision 4(b)(5), provides that the 2-year time bar does not apply in circumstances in which "the petitioner establishes to the satisfaction of the court that the petition is not frivolous and is in the interests of justice." In this case, the State argued, and the district court agreed, that granting the petition was not in the interests of justice. The interests of justice are only implicated in "exceptional and extraordinary situations," creating a high standard for

---

gave false testimony; (2) the jury might have reached a different conclusion without that testimony; and (3) the party seeking a new trial was surprised by the false testimony and "was unable to meet it or did not know of its falsity until after the trial." *Id.* (quoting *Williams II*, 692 N.W.2d at 896).

[7] Although the district court additionally determined that Williams could not satisfy the *Rainer* test for entitlement to a new trial, we need not reach that issue here. Williams fails in the first instance to meet the standard required by the newly-discovered-evidence exception.

16

petitions to meet. *Carlton v. State*, 816 N.W.2d 590, 607 (Minn. 2012) (internal citation omitted). When a petitioner claims that a delay in filing a petition for postconviction relief is excused for some reason, we consider whether some injustice has prevented a timely filing. *Sanchez v. State*, 816 N.W.2d 550, 557 (Minn. 2012). An interests-of-justice exception claim must therefore allege an injustice "related to a delay in filing a petition, not an injustice related to the substance of a petition." *Blanche v. State*, 988 N.W.2d 486, 492 (Minn. 2023).

Neither an injustice nor a challenge to the integrity of the proceedings is presented here. Williams claims that his mental illness prevented him from filing a timely postconviction relief petition. He claims to have been the subject of 14 civil commitment petitions, 13 of which were initiated by the State during his incarceration for the convictions at issue here, and that due to limited mental capacity, he cannot identify and raise issues without the assistance of counsel.

As the district court here rightly noted, Williams made these same claims in earlier proceedings, including to the district court in *Williams III*. *See Williams III*, 869 N.W.2d at 319 n.4. The district court here detailed the reasons why his arguments did not suffice over a decade ago, and Williams makes no argument as to why a different outcome should result today. It is still true, as it was then, that Williams has been sufficiently competent to file his direct appeal from his conviction, postconviction petitions, and appeals from postconviction petitions. He does not explain why he was able to pursue those claims and yet was unable to timely file this petition. We found in *Williams III*, when we affirmed the

district court's order denying relief, that no evidence supported his claim that mental illness prevented him from pursuing relief. We do the same today. 869 N.W.2d at 319.

## CONCLUSION

For the foregoing reasons, we affirm the order of the district court denying the petition and evidentiary hearing.

Affirmed.

THISSEN, J., took no part in the decision of this case.