**Edbert Neal WILLIAMS, petitioner, Appellant,**

v.

**STATE of Minnesota, Respondent.**

No. A04–558.

Supreme Court of Minnesota.

March 10, 2005.

Paul C. Thissen, Elizabeth M. Brama, Margaret E. Adamczyk, Briggs and Morgan, P.A., Minneapolis, MN, for appellant.

Mike Hatch, Atty. Gen., Susan Gaertner, Ramsey County Atty., Mark Nathan Lystig, Asst. Ramsey Count Atty., St. Paul, MN, for respondent.

## OPINION

ANDERSON, RUSSELL A., Justice.

A Ramsey County jury found Appellant Edbert Neal Williams guilty of first-degree premeditated murder in the stabbing death of Genelda Campeau, and guilty of attempted first-degree murder in the stabbing of Genelda's granddaughter, Shelly Campeau. Williams received a sentence of life imprisonment for the murder and a consecutive sentence of 180 months for the attempted murder. On direct appeal, we affirmed. *State v. Williams,* 593 N.W.2d 227 (Minn.1999).

In April 2003, Williams filed a petition for postconviction relief requesting a new trial based upon an affidavit recanting trial testimony. At the postconviction evidentiary hearing that followed, the witness contradicted the affidavit by testifying that his affidavit had been obtained by threats and was false and that his trial testimony was true. The postconviction court denied Williams' petition and this appeal followed. We conclude that the postconviction court did not abuse its discretion and we affirm.

To give context to Williams' postconviction claims, we recite briefly the facts from our 1999 opinion affirming Williams' convictions. *Williams,* 593 N.W.2d at 230–32. On January 12, 1996, Genelda Campeau

was stabbed to death in her Saint Paul home and her granddaughter, Shelly Campeau, was also stabbed, although her wounds were not fatal. Shelly identified Williams, her former boyfriend and the father of her child, as the assailant. Shelly testified that she saw Williams stab her grandmother, Genelda, and that Williams then stabbed her in the back and in the chest. According to Shelly, Williams had abused her in the past. A passerby identified Williams as the man fighting with Shelly in the yard outside Genelda's home. The passerby heard Shelly yell, "he killed my grandmother," and also heard Williams yell, "Shut the f—k up. Shut the f—k up. I'll kill you, b—ch." Williams was arrested a short time later not far from Genelda's home.

Darryl Irby, a felon who was cellmates with Williams before trial, testified that Williams admitted that he had killed Genelda and that he stabbed Shelly. According to Irby, Williams had offered him $1,000 to kill Shelly to assure that she did not testify at trial.

On December 13, 1996, a Ramsey County jury found Williams guilty of first-degree murder in the stabbing death of Genelda and of first-degree attempted murder in the stabbing of Shelly. He was sentenced to life imprisonment and to a consecutive term of 180 months of confinement. On April 22, 1999, we affirmed the conviction on direct appeal. *Williams,* 593 N.W.2d at 229, 239.

Williams filed his postconviction petition in April 2003 together with an affidavit dated June 5, 2001, from Irby. In his affidavit, Irby recanted his trial testimony,

explaining that he wanted to be sure that Williams was found guilty because Genelda was his distant relative. Irby stated that he befriended Williams, could not get him to confess, but nonetheless told an investigator that Williams had confessed to the stabbings. Irby further explained that he had deceived an investigator into believing that Williams planned to kill Shelly to prevent her from testifying. Irby also stated that Shelly confided to him that her boyfriend, Gary Bultman, murdered Genelda in order to collect life insurance proceeds, stabbed Shelly, and framed Williams for the crimes.

The postconviction court, which was also the trial court, scheduled an evidentiary hearing, which was continued several times at Williams' request to allow for witnesses to attend. The hearing was held on August 28, 2003. Williams' attorney informed the court that as of two weeks before the hearing, Shelly was in custody in Wisconsin and unavailable to testify.[1] Williams did not testify in support of his petition. Irby testified at the hearing that his trial testimony was true, that his affidavit recanting that testimony was false, and that he had never talked with Shelly and did not know her. Irby also testified at the hearing that while in prison, a fellow prisoner named Jackson had provided him with appellate briefs from the Williams case. According to Irby, Jackson and three other prisoners, whom Irby refused to identify over Williams' objection, had threatened him, telling him to help Williams or he would regret it.[2] Irby testified that he had been aided in preparing his false affidavit by the appellate briefs

---

1. In its findings, the postconviction court stated that "[d]espite numerous continuances at the request of the defense, Ms. Campeau never testified."

2. The postconviction court noted in its findings that Irby's prison records were consistent with his testimony that because of threats on his life from fellow inmates, he was transferred to another prison.

and by conversations with Jackson.[3]

The postconviction court denied Williams' petition, finding that there was ample evidence of his guilt apart from Irby's testimony and concluding that the result of the trial would have been the same had Irby never testified. This appeal followed.

## I.

 In postconviction proceedings, the burden is on the petitioner to establish, by a fair preponderance of the evidence, facts that warrant relief. *Dukes v. State,* 660 N.W.2d 804, 810 (Minn.2003). Our scope of review on factual matters is limited to whether there is sufficient evidence in the record to sustain the postconviction court's findings. *Butala v. State,* 664 N.W.2d 333, 338 (Minn.2003) (citing *Pittman v. Tahash,* 284 Minn. 365, 368, 170 N.W.2d 445, 447 (1969)). On issues of law, we exercise de novo review. *Id.* (citing *Rairdon v. State,* 557 N.W.2d 318, 324–25 (Minn.1996)); *State v. Knaffla,* 309 Minn. 246, 253–54, 243 N.W.2d 737, 741–42 (1976). We review the decision to deny a new trial petition based on recanted testimony for an abuse of discretion. *Whelan v. State,* 298 Minn. 545, 546, 214 N.W.2d 344, 345 (1974).

 A new trial may be granted when a witness has recanted or it has been discovered that false testimony was given at trial if (1) the court is reasonably well-satisfied that the testimony given by a material witness was false; (2) that without the testimony, the jury might have reached a different conclusion; and (3) that the party seeking the new trial was taken by surprise when the false testimony was given and was unable to meet it or did not know of its falsity until after the trial. *Opsahl v. State,* 677 N.W.2d 414, 422–23 (Minn.2004) (applying *Larrison v. United States,* 24 F.2d 82, 87–88 (7th Cir.1928), *overruled by United States v. Mitrione,* 357 F.3d 712, 718 (7th Cir.2004) (modifying rule in *Larrison*)). The third prong is not an absolute condition precedent to granting a new trial but is a factor the court should consider. *Opsahl,* 677 N.W.2d at 423; *Ferguson v. State,* 645 N.W.2d 437, 445 (Minn.2002). Courts have disfavored motions for a new trial based on alleged recantations, especially when changes in testimony have been occasioned by threats, pressure, and intimidation. *State v. Hill,* 312 Minn. 514, 523, 253 N.W.2d 378, 384 (1977).

 Williams claims that he is entitled to a new trial based on Irby's recantation of his trial testimony even though Irby withdrew the recantation at the postconviction evidentiary hearing and testified that his affidavit had been obtained by threat and that his trial testimony was true. According to Williams, Irby's affidavit contains "rich detail" that is believable when considered in the context of the entire trial record. Williams relies on the statement in Irby's affidavit that Irby spoke with Shelly and that Shelly confided to him that her former boyfriend, Bultman, murdered Genelda to collect life insurance proceeds and that Bultman also stabbed her. Williams suggests that "new evidence" that Bultman used the alias "Paul Ramsdell" potentially places Bultman at the murder scene, and Williams claims that he should be granted a new trial. We disagree.

To accept Williams' assertion that Shelly's trial testimony was a lie and that someone else committed the crimes, the

---

**3.** While unclear from the record, it appears that Williams was also in prison with Irby and that Irby had interacted with Williams.

postconviction court would have to rely on the hearsay statements attributed to Shelly in Irby's affidavit. Yet, Irby testified that those affidavit statements were false, that his affidavit was obtained by threat, and that he had never spoken to Shelly and did not know her. The postconviction court observed that, despite numerous continuances at the request of Williams, Shelly did not testify at the postconviction hearing. As we have already stated, the burden is on Williams to establish, by fair preponderance of the evidence, facts that warrant postconviction relief. *Dukes,* 660 N.W.2d at 804.

We also conclude that the evidence is sufficient to support the postconviction court's conclusion that Shelly's trial testimony, identifying Williams as the assailant, was highly credible, particularly in light of the trial testimony of the passerby who identified Williams as the individual she saw in front of Genelda's house, fighting with Shelly. According to the passerby, Shelly was yelling "He killed my grandmother." The passerby also heard Williams saying "Shut the f—k up. Shut the f—k up. I'll kill you b—ch." Williams was arrested a short distance from the crime scene.

Finally, for Williams to obtain a new trial based upon the recantation of Irby, the postconviction court must be reasonably well-satisfied that Irby's trial testimony was false, and that without his trial testimony, the jury might have reached a different result. *See Opsahl,* 677 N.W.2d at 423. If the postconviction court concludes that the recantation is not genuine, it need not consider the question of whether the jury may have reached a different result without the witness' testimony. *State v. Bowles,* 530 N.W.2d 521, 534 (Minn.1995). The postconviction court concluded both that the initial recantation was not genuine and that even without Irby's trial testimony the jury's verdict would have been the same. We agree. The trial witness testified at postconviction hearing that his trial testimony was true and that his recanting affidavit was false. In addition, there was evidence that the initial recantation was obtained under duress, and there was compelling evidence outside Irby's testimony to support the findings of guilt.

Affirmed.