STATE of Minnesota, Respondent,

v.

Quanartis DaLee TURNAGE, Appellant.

No. A06–1124.

Supreme Court of Minnesota.

April 5, 2007.

Michael F. Cromett, Assistant State Public Defender, Minneapolis, MN, for Appellant.

Mike Hatch, Minnesota Attorney General, St. Paul, MN, James C. Backstrom, Dakota County Attorney, Nicole E. Nee,

Assistant Dakota County Attorney, Hastings, MN, for Respondent.

## OPINION

GILDEA, Justice.

Following a jury trial, appellant Quanartis DaLee Turnage was convicted of two counts of first-degree murder and one count of intentional second-degree murder for the death of Wa Vang. The district court sentenced him to life in prison without the possibility of parole. We affirmed Turnage's convictions and sentence. *Turnage v. State*, 708 N.W.2d 535, 537 (Minn. 2006). Turnage's brother, Quantez Turnage, testified at trial against Turnage, pursuant to a plea agreement. While Turnage's direct appeal was pending, Quantez recanted the testimony he gave at Turnage's trial. Turnage filed a petition for postconviction relief, which the postconviction court denied without holding an evidentiary hearing. Turnage appeals the postconviction court's order. We affirm.

The facts surrounding the murder are set forth in our opinion affirming Turnage's conviction and we set forth only those facts necessary to resolve this appeal. *See* 708 N.W.2d at 537–41. As noted in our earlier opinion, Vang, the victim, was with Turnage, Quantez, and Damien Robinson the night he was murdered. All three men were prosecuted for their participation in the crime, but Turnage was the only one of the three to go to trial. Quantez and Robinson both pleaded guilty to intentional second-degree murder and received sentences of 339 and 299 months, respectively. Both testified for the state at Turnage's trial, but gave differing accounts of what had happened. Both men testified that Turnage participated in killing Vang. But they disagreed as to the level of their own involvement in the murder and each implicated the other.

According to Quantez, he had fallen asleep while he, Turnage, Vang, and Robinson were together in Robinson's car. When he awoke, Robinson's car was parked at the Cedarview Commons in North St. Paul, an apartment complex in which Quantez used to live. Quantez noticed that S.R., a woman Robinson was dating, was standing by the car and asking Robinson for money. Later, Turnage's friend, M.E., came to the car and talked to Turnage. Quantez then went back to sleep.

When Quantez awoke for the second time, he noticed the car was pulling into a long driveway. He also noticed that Robinson and Vang were arguing and tussling. Subsequently, Robinson and Turnage got out of the car, and Turnage let Quantez out. Quantez initially testified that when Vang got out of the car, Robinson hit Vang in the head with a miniature bat, and Vang took off running. But Quantez also provided a different account, explaining that after Turnage got out of the car, Turnage "leaned in" and swung a straight razor toward Vang. Quantez tried to grab the razor and got cut.

Quantez also testified that both Turnage and Robinson had knives in their hands and they both chased Vang. After a while, Turnage came back to the car and said, "This motherf. . . .r won't die." Turnage then went to the trunk and ran back out into the field. Eventually, Turnage returned to the car, went to the trunk again, closed the trunk, hopped in the car, and they sped off. Quantez estimated that Turnage and Robinson were in the field with Vang for 30 to 40 minutes. After returning to their apartment, Quantez testified that Turnage collected the clothes that Robinson and Quantez had worn and

put them in a bag with the weapons. Turnage and Robinson then left with the bag.

Robinson gave a different account of the roles that he, Turnage, and Quantez played in Vang's death. According to Robinson, he got out of the car at one point and Turnage let Quantez and Vang out of the car. Turnage then said "plug him" and stabbed Vang in the chest with a knife. Vang took off running, and Quantez tried to stab Vang with a knife. Turnage and Quantez then chased after Vang. After Quantez tackled Vang, both Turnage and Quantez stabbed Vang.

Robinson also testified that prior to the murder, Turnage had made a number of phone calls on Robinson's cell phone, including a call to M.E. in which Turnage asked M.E. for some knives. And Robinson stated that at the Cedarview Commons apartment complex, M.E. came out and handed Turnage a brown plastic bag.

Several other witnesses also testified at the trial. M.E. testified that at about 7:25 p.m., he received a phone call from Robinson's phone and an unknown male voice asked for some knives. M.E. brought a chef knife and a boning knife in a tan bag, went downstairs and handed the bag to the person sitting on the passenger side of Robinson's car. M.E. claimed he did not recognize anyone in the car because it was dark. At around 10 p.m., M.E. received another call from Robinson's phone where a person whose voice he did not recognize said somebody's fingers were cut and asked how to bandage a deep cut.

S.R. testified that, on the evening of the murder, she was at M.E.'s apartment and saw M.E. leave the apartment. She went out and saw Robinson, Turnage, and Quantez in Robinson's car. S.R. said that she saw M.E. standing on the side of the car talking to Robinson.

The state also called three witnesses who were held in custody with Turnage at various points before his trial. All three testified to statements Turnage made to them in which he implicated himself in the murder. Finally, while housed at the Ramsey County Workhouse from March 4 to March 18, 2004, Turnage made several phone calls to Quantez and M.E. that were tape recorded by the facility. The recordings of these phone calls were played for the jury, and in these calls, Turnage provided additional evidence of his involvement in the murder.

Turnage testified in his defense. He denied killing Vang and testified that he was not present when it happened. According to Turnage, he was doing laundry at a laundromat on the night of the murder. At around 8 p.m., after washing several loads of clothes, he went to a liquor store and bought some alcohol. He then talked to a friend on the street for about 10 to 15 minutes, and went back to his apartment. At around 9 or 9:30 p.m., Turnage received a call from a friend whom he then met in the alley behind Turnage's apartment building. They sat in a car, talked, and smoked marijuana together. After that, Turnage went back to the apartment. Soon after, Robinson called Turnage and asked Turnage to meet him in 10 minutes. After Turnage got into Robinson's car, Quantez showed his bleeding hand to Turnage. Turnage asked what had happened, and Robinson told him "dude gone, we had some business, dude gone."

The jury found Turnage guilty of two counts of first-degree murder and one count of intentional second-degree murder for the death of Wa Vang. The district court convicted Turnage and sentenced him on the first-degree murder conviction. Turnage argued on appeal that (1) the district court erred in admitting tape re-

cordings of calls Turnage made from the workhouse; (2) there was insufficient evidence to support his conviction; and (3) the district court erred in its jury instructions. *Turnage*, 708 N.W.2d at 537. We affirmed Turnage's convictions and the sentence of life in prison without the possibility of parole. *Id.*

On October 19, 2005, while Turnage's direct appeal was pending, Quantez signed a handwritten recantation of his trial testimony. The statement says in relevant part that "the [testimony] given at the [trial] of Qüanartis Turnage was lies given only because of a promise of less time. * * * Quanartis Turnage had no knowledge of this crime other than what I told him after it became public."

Turnage filed a petition for postconviction relief based solely on Quantez's recantation. The petition requested a new trial or an evidentiary hearing to establish that a new trial is warranted. The postconviction court held a hearing to determine whether Turnage's petition warranted a new trial or an evidentiary hearing. Following the hearing, the court issued an order denying both a new trial and an evidentiary hearing. Turnage appeals the postconviction court's order, requesting that we either grant a new trial or remand to the postconviction court for an evidentiary hearing to determine whether a new trial is appropriate.

### I.

The question presented in this appeal is whether Turnage is entitled to a new trial, or at a minimum to an evidentiary postconviction hearing, based on Quantez's recantation. Turnage has the burden of proving that he is entitled to the relief requested. Minn.Stat. § 590.04, subd. 3 (2006).

▆▆▆ We apply a three-prong test known as the *Larrison* test to determine whether a petition for postconviction relief warrants a new trial based on recantation of trial testimony. *Ferguson v. State,* 645 N.W.2d 437, 442 (Minn.2002) (citing *Larrison v. United States,* 24 F.2d 82, 87–88 (7th Cir.1928), *overruled by United States v. Mitrione,* 357 F.3d 712, 718 (7th Cir. 2004) (modifying test)). Under the *Larrison* test, a petitioner is entitled to a new trial due to witness recantation of trial testimony if

> (1) the court is reasonably well-satisfied that the testimony given by a material witness was false; (2) * * * without the testimony, the jury might have reached a different conclusion; and (3) * * * the party seeking the new trial was taken by surprise when the false testimony was given and was unable to meet it or did not know of its falsity until after the trial.

*Williams v. State,* 692 N.W.2d 893, 896 (Minn.2005); *Hooper v. State,* 680 N.W.2d 89, 94 (Minn.2004). The first two prongs are compulsory, but the third prong is not required in order to grant a new trial. *Opsahl v. State (Opsahl III),* 710 N.W.2d 776, 782 (Minn.2006). The postconviction court determined that Turnage did not meet either the first or the second *Larrison* prong. We review these determinations of the postconviction court for an abuse of discretion. *Williams,* 692 N.W.2d at 896.

### A. First *Larrison* Prong

In its order denying postconviction relief, the court stated that Quantez had no "disincentive" to recant his trial testimony. Therefore, the court concluded that it was not convinced that Quantez's testimony at trial was false.[1] Turnage argues that the

---

1. At a hearing held after the petition was filed, the postconviction court stated that

Quantez had "complete immunity because you can't try a person twice for the same

court abused its discretion by not holding an evidentiary hearing to determine Quantez's credibility before drawing conclusions about Quantez's trial testimony.

 The showing a postconviction petitioner must make in order to receive an evidentiary hearing is lower than the showing required for a new trial. *Opsahl v. State (Opsahl II)*, 677 N.W.2d 414, 423 (Minn.2004). A hearing is required unless "the petition and the files and records of the proceeding conclusively show that the petitioner is entitled to no relief." Minn. Stat. § 590.04, subd. 1 (2006). Any doubts by the court about whether to hold an evidentiary hearing should be resolved in favor of the party requesting the hearing. Ferguson, 645 N.W.2d at 446.

In *Wilson v. State*, 726 N.W.2d 103 (Minn.2007), we reversed the district court's denial of an evidentiary hearing based, in part, on a witness's recantation of trial testimony. We determined that an evidentiary hearing was appropriate because it was "difficult if not impossible to test [the recanting witness's] conflicting statements without examining [the recanting witness] under oath." *Id.* at 107. We concluded that absent a hearing, "the postconviction court cannot make a judgment about which story is true and which is false." *Id.* We reiterate here what we said in Wilson and in Ferguson regarding the necessity of an evidentiary hearing to resolve credibility issues. But because our analysis of the second *Larrison* prong is dispositive of this appeal, we do not decide whether the postconviction court abused its discretion under the first *Larrison* prong.

### B. Second *Larrison* Prong

 In its order denying postconviction relief, the postconviction court concluded that even if Quantez had not testified at Turnage's trial, "the jury would still have had a sufficient factual basis to reach the same verdict." Turnage argues that the court applied an incorrect legal standard for the second *Larrison* prong. Specifically, Turnage argues that it does not follow from the postconviction court's "sufficient factual basis" finding that the jury might not have reached a different verdict without Quantez's testimony, which is the correct focus of the second *Larrison* prong. We review the postconviction court's legal determinations de novo. *Williams*, 692 N.W.2d at 896.

 We agree with Turnage that the postconviction court's formulation of the second *Larrison* prong was erroneous insofar as it seemed to focus its inquiry on whether there was sufficient evidence to convict Turnage even without Quantez's testimony. Under the second *Larrison* prong, the court is to ask whether the petitioner has demonstrated "that without the [recanting witness's] testimony, the jury might have reached a different conclusion." *Williams*, 692 N.W.2d at 896; *see also Hooper*, 680 N.W.2d at 96 (affirming the postconviction court's holding that second prong not met because "even without [the recanting witness's] testimony, the strength of the other evidence presented at trial was such that the jury would not likely have reached a different conclusion"); *cf. Opsahl II*, 677 N.W.2d at 424 (holding that second prong was met because of the seven witnesses who testified for the state in a largely circumstantial case, the testimony of five of them was

offense." Turnage argues that the postconviction court incorrectly applied principles of double jeopardy in denying his petition. Because we determine that the second prong of

*Larrison* is dispositive, we do not decide whether the postconviction court committed a legal error in reaching its conclusion on the first prong.

either formally recanted or otherwise called into doubt in postconviction proceedings). As these cases make clear, the second *Larrison* prong does not ask whether the evidence was sufficient to convict the defendant in the absence of the recanted testimony. The question instead is whether the jury might have found the defendant not guilty if the recanting witness had not testified.

 Before turning to an analysis of this question, we first address the point raised in the dissent. The dissent concludes that Quantez's recantation needs to be analyzed under both the *Larrison* test for recanting witnesses and under the test for newly discovered evidence set forth in *Rainer v. State*, 566 N.W.2d 692, 695 (Minn.1997). The dissent also seems to suggest that we should reconsider our reliance on *Larrison* by noting that several jurisdictions do not follow it, and arguing that *Larrison* does not adequately address circumstances created where there is a recantation plus the addition of new exculpatory evidence. The dissent's thoughtful approach is not applicable to this case. Thus, we need not, and we do not, decide whether this approach should be followed if we were presented with a case where the petitioner provides evidence that a trial witness has recanted trial testimony and, in addition, offered a new version of the facts.

 The dissent's conclusion that this case needs to be analyzed under *Larrison* and *Rainer* is premised on the dissent's conclusion that "it is undisputed that Quantez was present at the commission of the murder" and that "his recantation testimony provides new eyewitness exculpatory testimony." But Turnage has the burden on postconviction to set forth facts entitling him to the relief requested. We have said that to carry this burden petitioners must do more than offer conclusory, argumentative assertions, without factual support. *See Rainer*, 566 N.W.2d at 695 (holding that anonymous letter was insufficient to entitle petitioner to hearing); *see also Morrissey v. State*, 286 Minn. 14, 16, 174 N.W.2d 131, 133–34 (1970) ("[P]ostconviction procedures * * * do not comprehend that a petitioner may have a full evidentiary hearing on the basis of bald assertions * * *."). The desire for finality in the criminal justice system is one reason it is appropriate to place this burden on the petitioner who seeks to set aside a conviction. *See Pederson v. State*, 649 N.W.2d 161, 163 (Minn.2002) ("A petition for postconviction relief is a collateral attack on a judgment which carries a presumption of regularity and which, therefore, cannot be lightly set aside.").

 We conclude that Turnage has not demonstrated that his petition should be analyzed under *Rainer* because the recantation and petition do not include specific facts that would constitute exculpatory evidence. *Cf. Wilson*, 726 N.W.2d at 107 (concluding that evidentiary hearing was warranted because newly discovered evidence included affidavits from "three new witnesses" who "swear that they witnessed the shooting and that [the petitioner] was not the shooter.").[2] Indeed, Turnage does

**2.** The recantation says that Quantez's testimony was "lies." The dissent reads this to mean that only a portion of Quantez's testimony was a lie, specifically that portion wherein Quantez implicated Turnage in the murder, and that other parts of Quantez's testimony, for example his admission to being present at the murder scene, were truthful. Because

Quantez was present at the murder scene, the dissent contends Quantez can conclude that "Turnage had no knowledge of this crime." The recantation, however, says only that "the [testimony] given at the [trial] of Quanartis Turnage was lies." It does not set forth what facts Quantez now claims to be the truth and neither the recantation nor the petition in-

not even argue in his brief to this court that he is entitled to relief because Quantez would have, had he testified truthfully, exonerated Turnage by testifying that while Quantez was at the scene of the murder, Turnage was not. Rather, Turnage argues that he is entitled to relief because Quantez recanted, and asks us to assess whether "the jury might have reached a different verdict without Quantez Turnage's false testimony." In light of Turnage's burden on postconviction to set forth specific facts—not conclusions—that would entitle him to relief, we conclude that the only test applicable to the recantation is the *Larrison* test. We turn now to the question of whether Turnage is entitled to relief under the second prong of the *Larrison* test.

Without Quantez's testimony, the jury still heard an eyewitness account of the murder through Robinson's testimony. Robinson testified that he saw Turnage stab Vang multiple times. It seems that the state's case against Turnage would have been even stronger without Quantez's testimony, because the inconsistency between Quantez and Robinson's version of events would have been removed from the case.

Furthermore, Robinson's account of events leading up to Vang's murder was corroborated in several aspects by M.E. and S.R. M.E. testified that he received a phone call requesting knives and delivered those knives to Robinson's car. S.R. testified that she saw Turnage in Robinson's car, contradicting Turnage's testimony that he was not with Robinson and Quantez during the car ride.

Separate from Robinson, the jury heard testimony from inmates housed with Turnage that Turnage implicated himself in the murder. Finally, Turnage's phone calls made from the Ramsey County Workhouse provided further evidence of his involvement in the murder of Vang. From our review of the record we cannot say that the jury might have found Turnage not guilty had it not heard from Quantez.

Based on this record, we hold that while the postconviction court did not articulate the correct legal formulation of the second *Larrison* prong, the postconviction court's denial of the petition was not an abuse of discretion. Because Turnage did not meet the second prong of the *Larrison* test, the postconviction court did not err in denying Turnage's petition and his request for an evidentiary hearing.

Affirmed.

HANSON, Justice (dissenting).

I respectfully dissent. I agree that Turnage has not yet satisfied his burden of proof to establish the right to a new trial because the presentation of the handwritten recantation statement by Quantez is not sufficient to do so. But I conclude that the recantation statement is sufficient to entitle Turnage to an evidentiary hearing. I reach that conclusion by first reformulating the analytical framework used by the majority because I believe the second *Larrison* factor, as traditionally applied by our court, does not completely address the issues presented by the recantation statement of Quantez.

*A. The Larrison Test Deals With the Withdrawal of Incriminating Testimony But Not the Addition of New Exculpatory Testimony.*

All of our previous applications of the *Larrison* test involved trial witnesses

---

cludes specific factual exculpatory evidence. The petition does not even say whether Quantez still maintains he was at the murder scene or whether the information Quantez shared with Turnage came to him from other sources or from his own first hand knowledge.

whose recantations only involved the withdrawal of incriminating testimony.[1] The recantation by Quantez likewise purports to withdraw Quantez's incriminating testimony concerning Turnage—"the [testimony] given at the [trial] of Quanartis Turnage was lies." But the recantation goes one step further when it also offers exculpatory testimony—"Quanartis Turnage had no knowledge of this crime other than what I told him after it became public." Because it is undisputed that Quantez was present at the commission of the murder, his recantation statement provides new eyewitness exculpatory testimony that supports the trial testimony of Turnage that Turnage was not even present at the commission of the murder.

The traditional framing of the second *Larrison* factor addresses only the withdrawal of the witness's trial testimony. It asks whether the jury might have reached a different conclusion "without the testimony." *Larrison v. United States*, 24 F.2d 82, 87 (7th Cir.1928). Where, as here, the witness offers both the withdrawal of his incriminating trial testimony and the substitution of new exculpatory testimony, the traditional *Larrison* test does not deal with the potential impact of the new exculpatory testimony.

This appears to be a case of first impression in Minnesota because none of our former cases involved the substitution of new exculpatory testimony. There are perhaps two options to fully address this new exculpatory testimony: (1) to reformulate the second *Larrison* factor to ask whether the jury might have reached a different conclusion if the witness had testified consistent with his recantation statement; or (2) to bifurcate the portion of the recantation statement that purports to withdraw the witness's incriminating trial testimony from the portion purporting to add new exculpatory testimony—dealing with the former under the *Larrison* test and the latter under the standard for post-conviction claims of newly discovered evidence. *See* Minn. R.Crim. P. 26.04, subd. 1; *Sutherlin v. State*, 574 N.W.2d 428, 434 (Minn.1998). The choice between these two options is important because the standard of proof required for a new trial under *Larrison* is lower than that required for a new trial based on newly discovered evidence.[2]

In choosing between these two options, we need to revisit *State v. Caldwell*, 322 N.W.2d 574, 584–85 (Minn.1982), where we adopted the *Larrison* test for recanted

1. *See, e.g., Wilson v. State*, 726 N.W.2d 103, 107 (Minn.2007) (a jailhouse informant withdrew his testimony that the defendant had confessed to committing the murder); *Hooper v. State*, 680 N.W.2d 89, 95 (Minn.2004) (witness recanted his trial testimony that the petitioner admitted to him that he murdered the victim); *Opsahl v. State*, 677 N.W.2d 414, 424 (Minn.2004) (five out of seven witnesses recanted their testimony that the defendant had made incriminating statements after the crime was committed); *Dukes v. State*, 660 N.W.2d 804, 809 (Minn.2003) (an eyewitness and accomplice to the murder recanted a statement that was read into evidence at the defendant's trial, stating that the statement "was a lie"); *Ferguson v. State*, 645 N.W.2d 437, 446 (Minn.2002) (the recanting witness

testified at trial that the defendant/petitioner told him that he was going to kill the victim and admitted to doing so shortly after the alleged murder); *Flournoy v. State*, 583 N.W.2d 564, 567 (Minn.1998) (the defendant's former girlfriend recanted her trial testimony that the defendant confessed to killing the victim).

2. A new trial will be granted under the *Larrison* test if the absence of the recanted testimony *might* have caused the jury to reach a different result, whereas a new trial will be granted for newly discovered evidence only if the evidence "probably would produce an acquittal or a more favorable result," placing a significantly greater burden on the petitioner. *Sutherlin*, 574 N.W.2d at 434.

testimony. In *Caldwell*, we contrasted the *Larrison* test from that applicable to newly discovered evidence, stating:

> In the case of ordinary newly-discovered evidence, as, for example, where a witness comes forward who did not testify at the defendant's trial, a heightened standard of materiality—that the new evidence "probably" would produce a different result—seems to be necessary because this new evidence has not been tried. The trial court is thus required to anticipate the effect on a second trial of evidence of unknown reliability. To avoid retrying defendants in all cases in which any new evidence, no matter how dubious or inconsequential, is discovered after trial, it became necessary to impose a rule permitting new trials only in those unusual circumstances in which the newly discovered evidence probably would produce a different result. The situation is different, however, where the evidence meets the requirements of the *Larrison* rule. In those cases, because the witness has recanted or other discovery has been made regarding the falsity of the testimony, the court has already been able to make a determination that the testimony actually was false; thus the matter of credibility, as it concerns a *second* trial, is less important. The "newly-discovered evidence" in such cases, in fact, is the *absence* of certain testimony, rather than the addition of new material, at a second trial. Thus the court is really considering what impact the false testimony had on the jury in the first trial; under *Larrison*, it is necessary only that the jury "*might* have reached a different conclusion" if the testimony had not been given.

*Id.* at 585 (footnotes omitted).

Using this framework from *Caldwell*, I would conclude that the better option for dealing with exculpatory evidence that is contained in a recantation statement is to separate it from the withdrawal of the incriminating testimony and subject it to the heightened standard for newly discovered evidence. The new exculpatory testimony described in Quantez's recantation statement, like the "ordinary newly-discovered evidence" described in Caldwell, has not been "tried" and is "of unknown reliability." *Caldwell*, 322 N.W.2d at 585. The heightened standard of materiality seems appropriate to avoid automatically retrying all such cases, no matter how dubious or inconsequential the new exculpatory testimony may be.

This option is also supported by the significant retreat in the federal circuit courts from the lower standard used in *Larrison*. Several circuits have rejected the "might have reached a different result" standard in the second *Larrison* factor, and replaced it with a probability standard, at least in those cases where the government did not knowingly or negligently use false testimony. *See, e.g., United States v. Williams*, 233 F.3d 592, 594–95 (D.C.Cir.2000); *United States v. Huddleston*, 194 F.3d 214, 219 (1st Cir.1999); *United States v. Sinclair*, 109 F.3d 1527, 1532 (10th Cir.1997); *United States v. Provost*, 969 F.2d 617, 622 (8th Cir.1992); *United States v. Krasny*, 607 F.2d 840, 844–45 (9th Cir.1979). In fact, the seventh circuit has itself overruled this aspect of *Larrison* and adopted a "reasonable probability" test. *United States v. Mitrione*, 357 F.3d 712, 718 (7th Cir.2004).

Treating the new exculpatory testimony of Quantez as newly discovered evidence, a new trial will be granted only if it meets the four factor *Rainer* test:

(1) that the evidence was not known to the defendant or his/her counsel at the time of the trial;

(2) that the evidence could not have been discovered through due diligence before trial;

(3) that the evidence is not cumulative, impeaching, or doubtful; and

(4) that the evidence probably would produce an acquittal or a more favorable result.

*Rainer v. State,* 566 N.W.2d 692, 695 (Minn.1997).

Because the majority opinion only addresses the question of "whether the jury might have found the defendant not guilty if the recanting witness had not testified," it does not resolve the newly exculpatory testimony presented in Quantez's statement. And, although the standard for newly discovered evidence is higher than that for withdrawn testimony, the failure of Turnage to meet the second *Larrison* factor by the withdrawal of Quantez's trial testimony does not necessarily compel the conclusion that Turnage could not meet the fourth *Rainer* factor because the focus is different—the *Larrison* factor focuses on the absence of any testimony from Quantez while the *Rainer* factor focuses on the presence of new testimony.

If the analysis is thus reformulated into two questions, we can proceed to answer them separately.

*B. Did Turnage Satisfy the Second Larrison Factor for Withdrawn Testimony?*

I agree that Quantez's recantation statement, by itself, does not sufficiently satisfy the second *Larrison* factor to require a new trial. But, I conclude that the statement was at least sufficient to warrant an evidentiary hearing to address each of the *Larrison* factors. Clearly, the postconviction court should not answer the first *Larrison* factor—whether Quantez's trial testimony was false—without an evidentiary hearing to test that statement. We have regularly cautioned against making reliability determinations without an evidentiary hearing. *See, e.g., Wilson v. State,* 726 N.W.2d 103, 107 (Minn.2007); *Opsahl v. State,* 677 N.W.2d 414, 423–24 (Minn.2004).

The majority attempts to avoid this concern about the first *Larrison* factor by, in essence, assuming that this factor has been met and proceeding to the second *Larrison* factor to determine if the absence of any testimony from Quantez might have produced a different result. To hold that the second *Larrison* factor was not met, the majority must conclude that the absence of testimony from Quantez could not possibly have changed the result. In other words, if it is not enough to simply conclude that the other evidence would be sufficient to convict, because we must ask the more difficult question of whether the absence of Quantez's testimony "might" have made a difference, we should not give a negative answer to that question summarily, without a hearing, unless we are satisfied that there is no possibility that the absence could have made a difference. I find that question to be a close call. If this were the only aspect of Quantez's recantation statement, I might be inclined to agree with the majority. But because it is not the only aspect, I respectfully disagree and conclude that an evidentiary hearing is warranted, for the reasons discussed below.

*C. Did Turnage Satisfy the Fourth Rainer Factor for Newly Discovered Evidence?*

Similarly, the recantation statement is not, by itself, sufficient to warrant a new trial under *Rainer.* But the more difficult question is whether it meets the much lower threshold to warrant an evidentiary hearing.

The practical consequence of the failure of the postconviction court to provide an evidentiary hearing likely is that we must either determine that the newly discovered evidence is insufficient to present genuine issues of material fact or we must assume, for purposes of a *Rainer* analysis, that the newly discovered evidence is true. Clearly, Quantez's new exculpatory testimony is relevant and material and we could not conclude that the trial record "conclusively" shows that the new exculpatory testimony is false. *See, e.g., Ferguson v. State,* 645 N.W.2d 437, 446 (Minn.2002). And if we assume that Quantez's new exculpatory testimony is true, the conclusion that a jury probably would not have acquitted Turnage if it had heard the exculpatory testimony is not clear, even though the *Rainer* standard that Turnage must meet is higher than the *Larrison* standard. The potential impact on the jury of the testimony of an admitted perpetrator that the defendant was not present during the commission of the crime would necessarily be greater than the impact of the failure of that perpetrator to testify at all.

The majority interprets Quantez's recantation statement somewhat differently, concluding that it does not "include specific factual exculpatory evidence." I agree that the recantation statement is minimal and also somewhat ambiguous. For example, when Quantez writes that his trial testimony "was lies," it is unclear whether he is referring to all of the testimony, including his description of his role in the crime, or just his testimony implicating Turnage. But, in my view, that ambiguity underscores the need for an evidentiary hearing to sort out what Quantez currently claims is the truth. Because Quantez pleaded guilty for his involvement in the murder, and is currently serving a prison sentence under the resulting conviction, I would not read his statement to mean that he now denies his own involvement. I read his further statement, that Turnage "had no knowledge of the crime," when made by someone who has previously admitted being present for the crime, to be a factual statement, albeit phrased in a conclusory manner.

I recognize that the newly discovered evidence presented in *Wilson v. State* was stronger than that presented here—three eyewitnesses whose proposed testimony would exculpate the defendant. But I am drawn to the same conclusion that we reached in *Wilson*—that the newly discovered evidence was sufficient to warrant an evidentiary hearing in order to fully develop the *Rainer* factors, including credibility determinations. 726 N.W.2d at 107. And, because the *Larrison* and *Rainer* issues arise from the single recantation statement of Quantéz and are necessarily interrelated, I would remand to the postconviction court for an evidentiary hearing on both aspects of the recantation statement.

ANDERSON, Paul H., J. (dissenting).

I join in the dissent of Justice Hanson.