*This opinion will be unpublished and may not be cited except as provided by Minn. Stat. § 480A.08, subd. 3 (2014).*

**STATE OF MINNESOTA
IN COURT OF APPEALS
A13-2211**

State of Minnesota,
Respondent,

vs.

Jose Manuel Ortiz,
Appellant

**Filed August 3, 2015
Affirmed
Worke, Judge**

Hennepin County District Court
File No. 27-CR-12-41140

Lori Swanson, Attorney General, St. Paul, Minnesota; and

Michael O. Freeman, Hennepin County Attorney, Linda M. Freyer, Assistant County Attorney, Minneapolis, Minnesota (for respondent)

Max A. Keller, Lexie D. Stein, Minneapolis, Minnesota (for appellant)

Considered and decided by Worke, Presiding Judge; Cleary, Chief Judge; and Smith, Judge.

## UNPUBLISHED OPINION

**WORKE**, Judge

Appellant challenges the district court's denial of his petition for postconviction relief, arguing that (1) he was denied effective assistance of counsel, (2) the evidence was

insufficient to support his convictions, and (3) the combined effect of all errors deprived him a fair trial. We affirm.

## FACTS

On August 29, 2012, A.C. reported to police that she had been sexually assaulted during a massage by the massage therapist appellant Jose Manuel Ortiz. Ortiz was charged with third- and fourth-degree criminal sexual conduct, under Minn. Stat. §§ 609.344, subd. 1(o), .345, subd. 1(o) (2012).

On August 13, 2013, the district court held a court trial. A.C. testified that because her regular massage therapist was not available on August 29, she scheduled her massage with Ortiz. Ortiz and A.C. discussed the type of massage she preferred. A.C. identified areas of focus, including her gluteal muscles (glutes). Ortiz told A.C. to remove her underwear. While A.C. had removed her underwear at prior massages, she had never been so instructed; therapists told her to undress to her comfort level. Ortiz left the room and A.C. undressed, laid face-down on the massage table, and covered herself with a blanket.

Ortiz began working on A.C.'s upper body. When he moved to A.C.'s lower body, Ortiz lowered the blanket significantly, and applied more oil than A.C. typically experienced during a massage. Ortiz exposed A.C.'s entire buttocks while he worked on her right-side glutes. Ortiz maneuvered his hands to nearly touch the curve between A.C.'s leg and buttocks, to her inner thigh. A.C. felt uncomfortable but did not say anything. Ortiz asked A.C. if she "liked it" several times, to which she felt uncomfortable responding.

2

At one point, Ortiz "slipped his finger on the crevice of [the] outer part of [A.C.'s] vaginal area." A.C. was shocked and looked at Ortiz, who raised his hand and said, "whoops accident." About an hour into the 90-minute massage, Ortiz thrust his fingers in and out of A.C.'s vagina three or four times. A.C. told Ortiz to stop. But Ortiz "started rubbing the outer part of [A.C.'s] vagina." A.C. did not end the massage because she did not know what to do, she was embarrassed, and she was scared to leave.

A.C. then turned onto her back. Ortiz massaged A.C.'s calves, bent over, and "put his mouth over [her right] foot and sucked [her big] toe." Ortiz tried to separate A.C.'s legs and she kicked him. A.C. began crying and told Ortiz that she wanted to go. Ortiz told A.C. that he would leave so that she could dress. When Ortiz returned, A.C. told him that what he did was wrong. Ortiz told A.C. that "it was beautiful that [she] was able to have a release, that it was important for [her] to have a release with him and that [she] should continue this work with him."

A.C. walked by two female employees as she exited. She did not say anything to them because they were young and A.C. did not think that they could do anything for her. A.C. was also humiliated, and she wanted to leave quickly and avoid talking to anyone.

On her way home, A.C. called her friend, S.D. S.D testified that A.C. was hysterical and crying. A.C. told S.D. that she may have been assaulted during a massage. S.D. told A.C. to call the police, which she did. Two officers met A.C. at her home. One officer swabbed A.C.'s toe. A.C. went to the hospital for a medical examination. The sexual assault nurse examiner (SANE) took a second swab of A.C.'s toe.

3

A crime-lab analyst who tested the swabs testified that the swab taken by the officer tested negative for saliva, but the swab taken by the SANE tested positive for saliva. The results were not surprising because different individuals collected the samples, and the negative test likely meant that the sample was too small for a positive result. The DNA profile found on the first swab indicated a mixture of two or more individuals, including A.C. Ortiz could not be excluded as a contributor, although 99.99% of the general population was excluded. The second swab was also a mixture. Again, Ortiz could not be excluded as a contributor, although 99.99% of the general population was excluded. The analyst testified that DNA could be transferred to a toe from someone's lip, but it is more likely for DNA to be transferred from the transferee's mouth by sucking or licking. She also testified that, although she did not test a vaginal swab, it would be unlikely to find DNA as a result of digital penetration.

Ortiz waived his right to testify. The parties stipulated to the admission of a redacted surveillance video showing A.C. arriving for her appointment and leaving after her appointment, and agreed that A.C.'s statements to police would not be offered because there were no transcripts. The district court found A.C. to be credible and found Ortiz guilty of third- and fourth-degree criminal sexual conduct.

Ortiz filed a direct appeal, but the appeal was stayed so that Ortiz could pursue postconviction relief. Ortiz petitioned for postconviction relief, claiming that he was denied effective assistance of counsel. The district court denied Ortiz's petition for postconviction relief, concluding that most of Ortiz's claims involved trial tactics, which are not reviewable. The court concluded that even if reviewable, trial counsel's tactics

did not fall below an objective standard of reasonableness, and Ortiz failed to establish that different tactics would have resulted in a different outcome. Ortiz also argued that his attorney failed to discuss his right to testify and his right to a jury trial. The district court credited an affidavit submitted by Ortiz's trial attorney, in which he stated that Ortiz was fully advised of the advantages and disadvantages of testifying and not testifying. The district court likewise concluded that Ortiz failed to provide evidence that he did not voluntarily waive his right to a jury trial. This appeal follows.

## D E C I S I O N

### *Assistance of counsel*

Ortiz argues that he received ineffective assistance of counsel. "When a defendant initially files a direct appeal and then moves for a stay to pursue postconviction relief, we review the postconviction court's decisions using the same standard that we apply on direct appeal." *State v. Beecroft*, 813 N.W.2d 814, 836 (Minn. 2012). This court reviews ineffective-assistance-of-counsel claims de novo. *Opsahl v. State*, 677 N.W.2d 414, 420 (Minn. 2004).

Ortiz bears the burden of proof on establishing the ineffective-assistance-of-counsel claim. *See State v. Jackson*, 726 N.W.2d 454, 463 (Minn. 2007). To satisfy this burden, he "must do more than offer conclusory, argumentative assertions, without factual support." *State v. Turnage*, 729 N.W.2d 593, 599 (Minn. 2007). Ortiz must show that his attorney's representation "fell below an objective standard of reasonableness" and that, but for the attorney's conduct, the result would have been different. *Strickland v. Washington*, 466 U.S. 668, 687-88, 694, 104 S. Ct. 2052, 2064, 2068 (1984); *Gates v.*

5

*State*, 398 N.W.2d 558, 561 (Minn. 1987) (adopting *Strickland* test). This court need not analyze both prongs of the *Strickland* test if an analysis of one prong is determinative. *Leake v. State*, 767 N.W.2d 5, 10 (Minn. 2009).

"[A]n attorney acts within the objective standard of reasonableness when he provides his client with the representation of an attorney exercising the customary skills and diligence that a reasonably competent attorney would perform under the circumstances." *Dukes v. State*, 621 N.W.2d 246, 252 (Minn. 2001) (quotation omitted). "[T]he performance inquiry must be whether counsel's assistance was reasonable considering all the circumstances." *Strickland*, 466 U.S. at 688, 104 S. Ct. at 2065. When examining all the circumstances, this court is to "eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Id.* at 689, 104 S. Ct. at 2065. We must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Id.* (quotation omitted).

### Trial strategy

Ortiz challenges much of his counsel's trial tactics: (1) his attorney refused to meet him, (2) his attorney failed to prepare for trial, and (3) his attorney failed to investigate the complainant's history. Because "[r]epresentation is an art, and an act or omission that is unprofessional in one case may be sound or even brilliant in another[,] [w]hat evidence to present to the jury, including which witnesses to call, represents an

6

attorney's decision regarding trial tactics and lies within the . . . discretion of trial counsel." *State v. Doppler*, 590 N.W.2d 627, 633 (Minn. 1999) (quotation and citation omitted). Appellate courts, having the benefit of hindsight, do not review for competency matters of trial strategy. *Id.* But even if we were to review Ortiz's claims, our following analysis shows that he falls short of showing that counsel was ineffective.

### *Refused to meet*

Ortiz claims that copies of text messages show that his attorney refused to meet with him. The messages show that Ortiz asked to meet his attorney in January 2013, and they agreed on a date, time, and place to meet. It is unclear from the record whether they met. On May 6, Ortiz requested to meet his attorney on a particular date, but his attorney replied that he had another trial on that date and suggested they meet at the end of June. Again, it is unclear whether they met. On June 19, Ortiz asked when they could talk about the case. It is unclear whether they met to talk about the case. On July 29, Ortiz asked his attorney if they were meeting anytime soon, and asked what time his trial was scheduled. On August 5, Ortiz asked his attorney for the time and location of his trial, and asked if they needed to get together. His attorney replied with the trial information and stated that they did not need to meet.

The messages do not establish that Ortiz's attorney refused to meet with him. Rather, they show agreements to meet. There is nothing in the record showing that these meetings did not occur. And Ortiz's responses do not mention failures to meet or protests to rescheduling. The record does not support Ortiz's claim that counsel refused to meet.

7

### *Failed to prepare for trial*

Ortiz claims that his attorney met with him only two times and never discussed trial tactics, including (1) whether to call character witnesses, (2) whether to call fact witnesses and produce evidence, and (3) how to adequately cross-examine the lab analyst. But our supreme court has stated that "the number of attorney-client consultations" and "limited trial preparation" does not establish inadequate representation. *State v. Caldwell*, 803 N.W.2d 373, 387 (Minn. 2011); *see also McKenzie v. State*, 754 N.W.2d 366, 370 (Minn. 2008) (concluding that allegation that trial counsel met with him only twice before trial was simply an argumentative assertion with no factual support and no showing as to how it constituted ineffective assistance of counsel).

Ortiz argues that if he had discussed the trial with his attorney, he would have "chosen to introduce his own evidence and witnesses." But these were not Ortiz's decisions to make. "The decisions on what witnesses to call, whether and how to conduct cross-examination, . . . what trial motions should be made, and all other strategic and tactical decisions *are the exclusive province of the lawyer* after consultation with his client." *State v. Rosillo*, 281 N.W.2d 877, 879 (Minn. 1979) (emphasis added) (quotation omitted). Even though Ortiz's claims involve strategy that were for his attorney to resolve, our following analysis shows that Ortiz fails to establish that his attorney was ineffective in trial preparation.

### *Character witnesses*

Ortiz claims that he would have called character witnesses that his attorney failed to call. Ortiz asserts that these witnesses would have attested to his credibility because

8

they wrote letters on his behalf for his sentencing. He claims that the evidence from character witnesses would have established that Ortiz would never commit this crime.

First, it is uncertain whether character witnesses would have testified because the record is devoid of any affidavit from potential witnesses stating that they would testify. Second, even if the testimony from the character witnesses had been admissible, Ortiz fails to show that testimony about his character would outweigh A.C.'s testimony, which the district court found credible, and the corroborating forensic evidence. The district court provided several reasons for crediting A.C.'s testimony; thus, it is unlikely that a character witness would have altered the district court's determination that A.C. was truthful.

### Fact witnesses/evidence

Ortiz admits that there were "no witnesses during the alleged incident." He claims that this made it necessary for his attorney to have called the female employees to describe A.C.'s demeanor after the massage. Additionally, Ortiz claims that his attorney should not have stipulated to the redacted video, because the full video would have shown adult female employees rather than the youthful ones A.C. described. He claims that this was necessary to refute A.C.'s claim that she did not tell them what happened because they were very young.

The redacted video showed A.C. arrive and leave. The district court determined that it did not need to view footage when A.C. was out of view in the massage room. It was not unreasonable for Ortiz's attorney to stipulate to admission of the redacted video of the relevant footage of A.C. Additionally, A.C. testified that she "didn't want to tell

9

two young girls what had happened to [her] [but] it might have been different if it was an older woman maybe." A.C. did not say that she would have told an older woman. In fact, A.C. testified that she was not comfortable talking to anyone and that she just wanted to leave. Thus, the employees' ages were not critical because A.C. stated that she was not comfortable talking to anyone.

### *Cross-examination*

Ortiz claims that his attorney failed to properly cross-examine the forensic analyst. Ortiz asserts that a proper examination would have revealed other explanations as to how his saliva was on A.C.'s toe. He claims that he "could have wiped his mouth . . . and/or sneezed or coughed causing his saliva to end up on her toe." Neither of the two affidavits that Ortiz filed in support of his petition includes a statement that Ortiz wiped his mouth, sneezed, or coughed while massaging A.C. This is an assertion without factual support. *See Turnage*, 729 N.W.2d at 599. Moreover, the analyst testified that DNA could be transferred to a toe from someone's lip, but it is more likely for DNA to be transferred from the transferee's mouth by sucking or licking.

Ortiz also argues that his attorney's cross-examination was inadequate because the analyst testified that she did not examine the vaginal swab because the case involved "consensual coitus." Because this was not the case, Ortiz claims that "her fundamental misunderstanding . . . . calls into question all of her work." The analyst testified that she did not test the vaginal swab based on information from the sexual assault evidence kit. She testified that based on the information of "where the alleged assault took place and the information of consensual coitus, [she] determined that the first place that should be

10

tested was . . . the swab from the big toe." Based on the information she had, she believed that the sexual assault was the sucking of the toe, not penetration of the vagina. But this misunderstanding had no effect on the testing the analyst conducted of the swabs of A.C.'s toe; it merely resulted in her not testing the vaginal swab. And based on the analyst's testimony, testing of the vaginal swab may have been futile, because it is unlikely to find DNA as a result of digital penetration.

### *Failed to investigate the complainant's history*

Ortiz next argues that his attorney failed to investigate A.C.'s history or file pretrial motions. Ortiz asserts that had his attorney investigated, it could have been determined whether A.C. "had a prior motive to make up false accusations," which would have challenged her credibility and resulted in a different outcome. But failure to investigate is not error by defense counsel without a showing that significant exculpatory evidence would have been discovered. *Crisler v. State*, 520 N.W.2d 22, 26 (Minn. App. 1994), *review denied* (Minn. Sept. 28, 1994).

In his second affidavit, Ortiz claimed that A.C. told police officers that she was "molested and raped when [she] was four." The police interviews are not part of the record. There is no evidence of medical records, child-protection records, or any other records relevant to a past sexual assault. And even if records were discovered that revealed that A.C. was assaulted as a child, and these records were determined to be admissible, Ortiz fails to adequately explain why A.C. would falsely accuse him of sexual assault based on her being sexually assaulted as a child. In his second affidavit, he suggested that: "she had a deep emotional response to deep-tissue massage, triggering a

11

flashback to a past occasion where she was sexually assaulted (possibly by a relative)." But there is no support in the record for this assertion.

Ortiz also claims that A.C. was "diagnosed as Bipolar . . . before the alleged incident occurred. [Appellate] counsel has proof that [A.C.] has this medical condition." Again, there is no support in the record for this assertion. Ortiz cannot meet his burden of establishing that counsel was ineffective with a conclusory, argumentative assertion that lacks factual support. *See Turnage*, 729 N.W.2d at 599.

Ortiz presents many challenges to trial counsel's strategy. These trial tactics were within counsel's discretion and are not reviewable on appeal. But even if these challenges were reviewable, while Ortiz demonstrates that counsel's representation lacked quality, he fails to meet the high standard of establishing unreasonable representation. Because he fails to show unreasonable representation, we need not address prejudice. *See Leake*, 767 N.W.2d at 10.

*Waivers*

Ortiz also argues that he was denied effective assistance of counsel because his attorney failed to explain the advantages and disadvantages of testifying before Ortiz waived his right to testify.

A defendant's right to testify is personal and may be waived only by the defendant. *See Rosillo*, 281 N.W.2d at 878. The defendant's waiver must be knowingly and voluntarily made. *State v. Walen*, 563 N.W.2d 742, 751 (Minn. 1997). When a defendant knows and understands his right to testify, a claim that his attorney denied him the right to testify fails "absent some indication in the record that [his] lawyer[] coerced

12

[him] into not testifying by applying undue pressure, using illegitimate means, or otherwise depriving [him] of [his] free will." *State v. Berkovitz*, 705 N.W.2d 399, 407 (Minn. 2005). The defendant has the burden of proving that he did not voluntarily and knowingly waive the right to testify. *Walen*, 563 N.W.2d at 751.

Ortiz admits that he spoke with his attorney about waiving the right to testify and understood the reasons why he should waive this right, but claims that "in reality" he was "unaware of the reasons for doing so" because his attorney never informed him of the advantages and disadvantages of doing so. The following is Ortiz's waiver:

> Counsel: Mr. Ortiz, you and I have discussed on several occasions your right to testify in this trial, is that correct?
> Ortiz: Yes, correct.
> Counsel: And do you understand that you have a right to testify in your own defense?
> Ortiz: Yes.
> Counsel: And you also have a right to choose not to testify, do you understand that?
> Ortiz: Yes, I do.
> Counsel: And whether you choose or not choose to testify it is your choice and your choice alone, correct?
> Ortiz: Yes.
> Counsel: I can give you counsel, I can give you advice, but that decision is going to be a voluntary decision that's going to rest entirely with you, do you understand that?
> Ortiz: Yes.
> Counsel: And have I given you advice on what to do?
> Ortiz: Yes.
> Counsel: And what decision did you understand?
> Ortiz: Not to do it.
> Counsel: To do what?
> Ortiz: Testify.
> Counsel: On your own behalf?

13

Ortiz:      Yeah.

Counsel:    Are you making this decision freely and voluntarily?

Ortiz:      Yes.

Counsel:    And again you understand that if you choose to testify the [district court] as the fact-finder or if you choose not to testify the [district court] couldn't hold that against you, do you understand that?

Ortiz:      Yes, I do.

Counsel:    All right. Do you have any questions for me or for the [district] court?

Ortiz:      No.

. . . .

The court:  Sir, have you had enough time to make this important decision today?

Ortiz:      Yes, Your Honor.

The court:  Okay and nobody's forcing you into making that [decision for yourself?]

Ortiz:      No.

There is no evidence in the record before this court to show that Ortiz's defense counsel did anything other than properly advise him. While Ortiz claims that he "did not even waive the right to testify[,] [h]e merely stated that he was advised by his attorney not to testify," he agreed that he made the "decision" freely and voluntarily. Agreeing that he made a *decision* is not merely stating that "he was advised by his attorney."

Additionally, in denying postconviction relief, the district court relied on an affidavit of Ortiz's attorney, which Ortiz does not contradict. The court stated:

> [Ortiz's attorney] submitted a sworn affidavit, from which we now cite: "Mr. Ortiz was fully advised of his rights, including his right to choose to testify or not to testify. He fully understood this right, and we discussed at length the advantages and disadvantages of each option. In fact, we specifically discussed the issue of saliva on the toe, and what his likely testimony would be. Mr. Ortiz himself agreed that his proffered testimony was likely not credible due to his unwillingness or inability to identify why his saliva and

14

> DNA were on the victim's toe. We discussed why this
> would cause a credibility gap, and how he would be subject
> to cross-examination by the state."

Ortiz claims that if he had been fully informed, he would have chosen to testify. He asserts that this would have changed the outcome because his attorney "made no argument regarding what actually happened during the massage." But his attorney argued during closing argument that nothing happened, that A.C. was uncomfortable with a new massage therapist and overreacted. Ortiz's waiver was valid and he fails to show that his attorney was ineffective for advising him to waive his right to testify.

Ortiz also argues that his attorney failed to explain the consequences of waiving a jury trial, and asserts that he did not validly waive this right. Ortiz has not provided a transcript for this court to review. It is Ortiz's responsibility to provide this court with a transcript. *See State v. Heithecker*, 395 N.W.2d 382, 383 (Minn. App. 1986). Nonetheless, the district court's order referenced a transcript of Ortiz's waiver, in which Ortiz agreed that he (1) had a right to "waive a jury trial and have a court trial where the judge would replace the jury," (2) discussed with his attorney the benefits of a jury trial and a court trial, and (3) "freely and voluntarily" decided that he wanted a court trial and was giving up the right to have a jury trial. With nothing else to review, we conclude that Ortiz's waiver was valid.

Additionally, in denying postconviction relief, the district court cited to trial counsel's affidavit. The court stated:

> [Ortiz's counsel's] sworn affidavit on this issue states that
> "Mr. Ortiz was fully advised of his right to have a trial by
> jury, or trial to the court. We fully discussed the advantages

15

and disadvantages of both options. For him to suggest he wasn't made aware is patently false. We spent considerable time weighing these options before trial. I was overwhelmingly satisfied that Mr. Ortiz knew the advantages and disadvantages of both options, and he was enthusiastic about trying the case to the court."

The record before us shows that Ortiz's waivers were valid; therefore, he fails to show that counsel was ineffective.

*Sufficiency of evidence*

Ortiz claims that the evidence was insufficient to support his convictions. In reviewing a claim of insufficient evidence, we apply the same standard to a jury trial or a bench trial. *State v. Hughes*, 355 N.W.2d 500, 502 (Minn. App. 1984), *review denied* (Minn. Jan. 2, 1985). We review the record to determine whether the evidence, when viewed in the light most favorable to the verdict, is sufficient to allow the fact-finder to reach the verdict that it did. *State v. Webb*, 440 N.W.2d 426, 430 (Minn. 1989). We will not disturb the verdict if the fact-finder, acting with due regard for the presumption of innocence and the requirement of proof beyond a reasonable doubt, could reasonably conclude that the defendant was guilty of the charged offense. *Bernhardt v. State*, 684 N.W.2d 465, 476-77 (Minn. 2004).

To find Ortiz guilty of third-degree criminal sexual conduct, the district court had to find that (1) Ortiz performed massage for hire, (2) A.C. was a user of that service, and (3) "nonconsensual sexual penetration occurred during or immediately before or after" Ortiz performed the services. Minn. Stat. § 609.344, subd. 1(o). To find Ortiz guilty of fourth-degree criminal sexual conduct, the district court had to find the first two elements

of third-degree criminal sexual conduct, but instead of finding that "nonconsensual sexual penetration occurred," it had to find that "nonconsensual sexual contact occurred during or immediately before or after" Ortiz performed the services. Minn. Stat. § 609.345, subd. 1(o).

Ortiz claims that the only evidence of sexual conduct was A.C.'s testimony, which was not corroborated. But in a criminal-sexual-conduct case like this, A.C.'s testimony "need not be corroborated." Minn. Stat. § 609.347, subd. 1 (2012). Ortiz concedes that corroboration is not necessarily required, but claims that some corroboration is required when the evidence is otherwise insufficient. Ortiz asserts that the only corroborating evidence was his saliva found on A.C.'s toe, which could have showed up for many innocent reasons.

Ortiz cites to *State v. Ani*, for the proposition that the absence of corroboration in a case may support a conclusion that the evidence was insufficient to find a defendant guilty beyond a reasonable doubt. 257 N.W.2d 699, 700 (Minn. 1977). That was not the case in *Ani*, however; the court stated that "the victim's testimony was positive and not contradicted, and was strongly corroborated by other evidence." *Id.*

Ortiz also cites to *State v. Huss*, in which a three-year-old child's "particularly troublesome" testimony was the only direct evidence that she had been abused by her father. 506 N.W.2d 290, 292 (Minn. 1993). The child testified for an hour before she accused both of her parents of touching her in a bad way; she denied having "yucky secrets"; she testified that six people had touched her private parts; she included a hug and a touch to her hair as bad touches; she had not seen her father for a year before trial,

but testified that she had taken a shower at his house on the day she gave her testimony; she was unable to identify her father in the courtroom; and she described her father as bald and blind, although he was neither. *Id.* In addition to the child's testimony being contradictory and inconsistent with her prior statements and other verifiable facts, there was the repeated use of a highly suggestive book on sexual abuse. *Id.* at 292-93. Based on the "unusual facts" of the case, the supreme court determined that the uncorroborated testimony, the only direct evidence, was insufficient to support a criminal-sexual-conduct conviction. *Id.* at 293.

This case is far from the situation in *Huss*, but is similar to *Ani* because A.C.'s testimony was positive and not significantly impeached. And there was corroborating evidence. First, A.C. promptly reported the incident. *See Powe v. State*, 389 N.W.2d 215, 219 (Minn. App. 1986) (evidence sufficient to support criminal-sexual-conduct convictions when victim reported the assault the evening it occurred), *review denied* (Minn. July 31, 1986). S.D. testified that A.C. called her and told her that she may have been assaulted during a massage. A.C. reported to the police and went to the hospital the night of the assault. Second, A.C. was hysterical and crying when she talked to S.D. *See State v. Mosby*, 450 N.W.2d 629, 635 (Minn. App. 1990) (victim's upset, emotional state after the assault provided corroboration for the criminal-sexual-conduct allegation), *review denied* (Minn. Mar. 16, 1990). Finally, Ortiz's saliva and DNA were found on A.C.'s toe; Ortiz could not be excluded as a contributor, although 99.99% of the general population was excluded. The evidence supports Ortiz's convictions.

*Cumulative effect*

Ortiz argues that even if each individual error was harmless, the cumulative effect of the errors warrants reversal. But we have not reviewed for harmless error. We reviewed Ortiz's ineffective-assistance-of-counsel claims to determine whether he established that his attorney's representation was unreasonable and that, but for the attorney's conduct, the result would have been different. None of his allegations support a conclusion that the result would have been different.

**Affirmed.**